[L.A. No. 30118. In Bank. Dec. 5, 1973.]

In re the Marriage of LOLITA A. and WILLIAM HOWELL HIGGASON. LOLITA A. HIGGASON, by her Guardian, etc., Respondent, v. WILLIAM HOWELL HIGGASON, Appellant.

**COUNSEL**

Lindsey & Newman and James T. Lindsey for Appellant.

Schramm, Raddue & Seed and Edward W. Schramm for Respondent.

## Opinion

**McCOMB, J.**—Appellant (hereinafter sometimes referred to as "the husband") appeals from an interlocutory judgment of dissolution of marriage, which judgment included an order (1) restraining him from entering the premises of respondent (hereinafter sometimes referred to as "the wife"), molesting her, or initiating any communication with her and (2) denying him any payment for temporary or permanent support, attorney's fees, or any other purpose.

The parties hereto were married March 2, 1969. At that time, the wife was 73 years old, and the husband was 48. The wife is a woman with substantial assets, whereas the husband at the time of the marriage was a waiter, earning $2 an hour plus tips, and had little or no means. At the time of the marriage, the husband was apparently in good health.

A few days prior to the marriage, the parties entered into an antenuptial agreement, which provided, in part: "Each party hereto waives and releases and renounces any and all interest present or future in or to any and all the properties real and personal of the other party. Each party waives, relinquishes and renounces any and all right to and in the estate of the other, all rights to share in the property of the other through the law of succession or rights to be or act as executor or administrator of the estate of the other, all rights of homestead in the real property of the other, of interest in the estate of the other for family allowance or by inheritance and any and all right for contribution to the support, maintenance and expenses of the other party."

On March 17, 1969, the wife was, on her own petition, adjudicated an incompetent person, and a conservator was appointed. The wife has two adopted adult children, a son and a daughter. At first, the son was appointed conservator, but subsequently a bank was substituted.

In August 1969, the wife filed an action for annulment of the marriage, but the action was later dismissed. In October 1969, she filed an action for dissolution of marriage. That action, however, was also later dismissed.

On September 28, 1970, the husband entered the residence of the parties about 10 p.m., accompanied by his chauffeur, after a week's absence. They both went to the husband's suite, which was not far from the wife's suite. Outside each suite stood an armed guard. The chauffeur left the husband's suite a little before 2:30 a.m. the following day. Afterwards, according to the husband's testimony, he was badly beaten by an assailant,

whom he never saw.[1] He was thereafter hospitalized; and during his hospitalization it was discovered that he had lung cancer, and one of his lungs was surgically removed. During his subsequent recuperation at the residence of the parties, he suffered a heart attack, which further disabled him. Substantial medical and hospitalization costs were incurred in connection with the husband's illnesses. At the times such costs were incurred, the parties hereto were residing together, and there were no proceedings pending in court between them.

On March 21, 1971, three or four men entered the husband's suite, packed his bags, and forcibly removed him from the family home. According to the wife's evidence, she was frightened by the activities of the husband, who reportedly was "up on booze and pills."

On March 22, 1971, the wife filed the present petition for annulment or dissolution of the marriage. She herself signed and verified the petition, as well as two declarations in support of an order to show cause for injunctive relief against the husband's visiting her premises. In view of the existence of the conservatorship, however, the proceedings were instituted in the wife's name by Lolita M. Lanning, her guardian ad litem. Mrs. Lanning, the wife's adopted daughter, was appointed guardian ad litem on March 22, 1971, in response to her petition filed therefor at the wife's request. The bank which had theretofore been appointed conservator of the wife's estate continued to act as such, but had declined to act as guardian ad litem in the marital proceeding.

On April 1, 1971, at a hearing on the order to show cause why a temporary restraining order should not be extended during the period of litigation, the husband made a motion to quash, on the ground that a guardian has no capacity to file an action for annulment or dissolution of marriage. His motion, however, was denied. During the course of the hearing, it was brought out that the husband was "a sick man" and that the wife was "quite ill." A continuance was granted to April 14, 1971.

On April 14, 1971, testimony was presented to the effect that the wife was ill and confined to bed under a doctor's care and that on March 20, 1971, she had requested her daughter, Mrs. Lanning, to come to her home, because she was afraid of the husband and had indicated that his presence would have a serious emotional effect upon her. The trial court concluded that there was "some sort of problem between the wife and the husband" and granted the preliminary injunction requested, enjoining the husband

---

[1]The sheriff's department investigated the matter, but discontinued the investigation, because the husband refused to cooperate with them.

from entering the family residence or initiating any communication with the wife. In commenting on the situation, the trial court stated, after granting the preliminary injunction, "The woman [wife] is not insane. She is not without ability to think."

On April 16, 1971, the husband filed his response to the wife's petition for dissolution of the marriage, requesting a reconciliation of the parties. In his response, the husband further requested spousal support, as well as attorney's fees and costs, and asked that property rights be determined as provided by law. He filed an order to show cause, seeking temporary spousal support of $2,500 a month, $2,500 attorney's fees, and $30 court costs; and he declared that his monthly needs amounted to $2,425.

A hearing on the order to show cause issued on behalf of the husband was held April 27, 1971. At that time a declaration by Dr. George J. Wittenstein, a Santa Barbara medical doctor specializing in thoracic and cardiovascular surgery, was filed, stating that the husband was totally disabled and that his future employment possibilities were limited to only the most sedentary type of employment requiring frequent resting. The husband testified that he had no funds; that he was living with his niece without paying her any money; that he was unable to care for himself or seek employment; that he owed medical bills in the amount of approximately $13,000; that he had been told when he entered the hospital, the wife signed the hospital forms, agreeing to pay his bills, but that they had not been paid; and that he owned a 1968 Cadillac, fully paid for, household furniture valued at approximately $2,500, and jewelry which he estimated to be worth about $5,000. In acquiring the Cadillac, the husband had traded in an older car and paid the balance due with some of the "spending money" given to him by the wife; he also used some of such "spending money" to pay for the household furniture and jewelry. He further testified that at the time he married the wife he had no interest in any money that she might have or the support that she might furnish him. He admitted that about two and a half or three months prior to the hearing he had started taking golf lessons, which he continued for about a month. At the conclusion of the hearing, the husband's request for support and attorney's fees was denied.

The hearing on the petition for dissolution of marriage took place on July 2, 1971. Prior thereto, the wife's counsel took her deposition, but through inadvertence of the husband's counsel, the husband was not represented at the deposition. At her deposition, the wife testified to the facts of the marriage and to irreconcilable differences and stated that as far as she was concerned the marriage was over. At the hearing, the wife's counsel started to lay the foundation for introduction of the deposition into evidence

through testimony by the guardian ad litem of the wife's physical inability to appear in court.[2] The deposition was thereupon introduced into evidence by stipulation.[3]

The husband testified that the antenuptial agreement was orally modified within a couple of weeks after the marriage, as a result of which he gave up his employment, and the wife thereafter paid him $1,500 a month

---

[2] In this respect, the guardian ad litem testified: "Q. What is her [the wife's] physical condition? A. She is ill. She was just released from the hospital Monday. Q. Is it possible for her to leave the house at this time? A. Oh, no." A declaration by the doctor attending the wife, to the effect that there was no indication that her condition would change in the future, was also received in evidence.

In *In re Marriage of McKim*, 6 Cal.3d 673, 682(11) [100 Cal.Rptr. 140, 493 P.2d 868], this court said: "[A] trial court must require the petitioner to appear personally and testify at the hearing unless, in exceptional circumstances where an explanation of petitioner's absence is shown to the satisfaction of the court, the court in its sound discretion permits the requisite proof to be made by affidavit as recognized by section 4511." In the present case, a satisfactory explanation of the wife's absence can be inferred from the evidence that she was ill and unable to leave the house; and her deposition may be regarded as an affidavit for the purpose of this requirement. (See *Saltzman v. Sunset Tel. etc. Co.*, 125 Cal. 501, 503 [58 P. 169].)

[3] The deposition reads in full as follows: "MR. SCHRAMM [Counsel for the guardian ad litem]: Let the record show that it is now, by my watch, seven minutes after the hour of 4:00 o'clock on the 18th of May. THE WITNESS: I think you are right. MR. SCHRAMM: What does your watch indicate, Mr. Reporter? THE REPORTER: My watch says four after, but I am sure it is slow. MR. SCHRAMM: Would you make a note in the record that your watch indicates four minutes after the hour? EXAMINATION BY MR. SCHRAMM: Q. Now, Mrs. Higgason, as I explained to you, this deposition is being taken in lieu of an appearance in court for you, to save you the difficulty and inconvenience of going down to court, because you have been suffering from an illness. A. Well, I have this arthritis in my knee. Q. Yes. Now, your name is Lolita Armour Higgason, is it not? A. That is right. Q. You are married to William Howell Higgason? A. Yes. Q. Now, I understand that the date of the marriage ceremony was March 2, 1969. Am I correct? A. I think so. Q. Shortly after your marriage, in August of the same year, you filed an action for annulment, didn't you? A. Yes. Q. Then that was dismissed? A. That is right. Q. Then in October, on October 6th of 1970, you filed an action for divorce against your husband? A. Yes. Q. That was dismissed, I gather. A. Yes. Q. Now, on March 22nd, you filed this pending action for divorce? A. Yes. Q. In your petition for dissolution of marriage, you stated that there are irreconcilable differences between you and your spouse, which have caused the irremediable breakdown of your marriage; is that true? A. Yes. Q. I understand that you feel that you have given your husband two chances, and the third time he struck out. A. Well, he thought I was taking dope, and that is more than I ever would take from anybody. I don't care whether it was family, or friends, or whatnot. Q. No, of course not. At any rate, as far as you are concerned, the marriage is over? A. Oh, yes, very much so. Q. Now, during the course of your marriage, you haven't been employed or had any earnings of any kind, have you? A. No. Q. And neither has your husband been employed at any time during the marriage? A. Not to my knowledge, no. Q. Of course, you have had no children. A. No. MR. SCHRAMM: Thank you. That is all there is. THE WITNESS: Thank you.

"[/s/]     LOLITA HIGGASON

W I T N E S S"

"spending money" and also paid for his other living expenses. The payments were initially made by the wife, but they were subsequently, until the time of the hearing herein, continued by the wife's conservator. The husband also testified that he was indebted to his attorney in the sum of $5,000 for services in the present proceeding and that he had no means with which to meet the obligation. In addition, he said that he owed other obligations totaling $9,781.65, including his medical and hospital bills.

At the conclusion of the hearing, the trial court denied the husband's motions for spousal support, division of community property, and payment of attorney's fees and costs and granted the wife's petition for interlocutory dissolution of marriage.

On November 3, 1972, counsel for the wife, after notice to counsel for the husband and apparently without objection on the part of the latter, prevailed upon the trial court to enter a final judgment of dissolution, on the ground that such was authorized by the holding of the Court of Appeal in *In re Marriage of Stuart,* 27 Cal.App.3d 834 [104 Cal.Rptr. 395], since the husband on his appeal herein had abandoned his attack on the interlocutory judgment insofar as it ordered the dissolution of the marriage.

On appeal, the husband's arguments are directed exclusively to the denial to him of any support or other financial benefits. The trial court's denial of support or other financial benefits to the husband was based on its conclusion that the antenuptial agreement precluded him from making any claim therefor. Although recognizing that there might be a public policy consideration against permitting a wife to waive support, the trial court concluded that there was no such public policy consideration against permitting a husband to do so.

■ *Questions*: First. *May a petition for dissolution of marriage be brought on behalf of a spouse who is under conservatorship by and through the spouse's guardian ad litem?*

*Yes.* Such a proceeding may be brought on behalf of a spouse under conservatorship by and through his or her guardian ad litem, provided it is established that the spouse is capable of exercising a judgment, and expressing a wish, that the marriage be dissolved on account of irreconcilable differences and has done so.

In the present case, this requirement has been met. Here, the trial court found that the wife was not insane and had the ability to think; the record

shows that the wife signed and verified the petition for dissolution of marriage and also two declarations in support of an order to show cause for injunctive relief against the husband's visiting her premises; and her deposition shows that she desired a dissolution of the marriage.

■ Under the terms of section 372 of the Code of Civil Procedure, when an incompetent person is a party to an action he must appear either by a guardian of the estate or by a guardian ad litem appointed by the court in which the action is pending. Although the mere fact that a conservator has been appointed does not constitute a determination that the conservatee is in any way "insane or incompetent" (cf. Prob. Code, § 1751; *Schuck* v. *Myers*, 233 Cal.App.2d 151, 154[1] [43 Cal.Rptr. 215]), section 372 of the Code of Civil Procedure specifically provides that "reference to 'incompetent person' shall be deemed to include 'a person for whom a conservator may be appointed.' " Under the circumstances, if the wife, being under conservatorship, had attempted to prosecute the action in her individual capacity, section 372 of the Code of Civil Procedure could have been raised against her right to bring it.

It has been argued that under the Family Law Rules only the husband and the wife are proper parties to an action for dissolution of marriage, with certain exceptions not here applicable, and that therefore the present proceeding was improperly brought.[4] A guardian ad litem, however, is not a party to an action or proceeding, but only a representative of a party, just as an attorney of record is not a party. (*Dixon* v. *Cardozo*, 106 Cal. 506, 507 [39 P. 857]; *Estate of Cochems*, 110 Cal.App.2d 27, 29-30 [242 P.2d 56]; see *Serway* v. *Galentine*, 75 Cal.App.2d 86, 89 [170 P.2d 32].) Accordingly, the husband and the wife are the parties in the present proceeding even though because of the requirement of section 372 of the Code of Civil Procedure the proceeding was instituted on behalf of the wife by and through her guardian ad litem.

In *Cohen* v. *Cohen,* 73 Cal.App.2d 330 [166 P.2d 622], decided before enactment of the Family Law Act, it was held that a guardian ad

---

[4]For instance, it is provided in California Rules of Court, rule 1210, as follows: "Every proceeding shall be prosecuted and defended in the names of the real parties in interest"; and rule 1211, subdivision (a), provides, "Except as provided in subdivision (b), the only persons permitted to be parties to the proceeding are the husband and wife." The exceptions in subdivision (b) relate to petitions for judgment of nullity on certain grounds not here alleged: underage, pre-existing valid marriage, and unsound mind when the marriage was entered into. (Civ. Code, §§ 4425-4426.) The provision for defense by a guardian or guardian ad litem of a proceeding for dissolution on the ground of incurable insanity is likewise inapplicable here. (Civ. Code, § 4510.)

litem could not obtain a divorce for an incompetent wife contrary to her expressed wishes. It was there implied, however, that if the wife's capability of consenting to a divorce were established, and if she verified the divorce pleadings and testified that she wanted a divorce, a divorce on her guardian ad litem's complaint might be proper. (73 Cal.App.2d at pp. 336-337.)

In the present case, as hereinabove pointed out, the wife's capability of consenting to a dissolution of marriage and her desire therefor may be considered established. Findings of fact were waived, and it must therefore be presumed that the trial court, in effect, found all the facts necessary to support the judgment in favor of the wife with respect to dissolution of the marriage and that every fact or inference essential to support of the judgment and warranted by the evidence was found by the court. (*Reid* v. *Valley Restaurants, Inc.,* 48 Cal.2d 606, 609[1] [311 P.2d 473]; *Greenfield* v. *Insurance Inc.,* 19 Cal.App.3d 803, 810(3) [97 Cal.Rptr. 164].)

█ Second. *Is the husband precluded by reason of the antenuptial agreement form obtaining any support or financial benefit from the wife?*

*No.* █ Antenuptial agreements, if they contain certain essential elements, are favored by the courts. To begin with, such an agreement must be made in contemplation that the marriage relation will continue until the parties are separated by death. Contracts which facilitate divorce or separation by providing for a settlement only in the event of such an occurrence are void as against public policy. (*Estate of Nelson,* 224 Cal. App.2d 138, 142[2] [36 Cal.Rptr. 352]; *Whiting* v. *Whiting,* 62 Cal. App. 157, 162-168 [216 P. 92]; see *Pereira* v. *Pereira,* 156 Cal. 1, 3-6; [103 P. 488].)

Insofar as an antenuptial agreement relates to the disposition of the property of the respective parties, and does not seek to alter support obligations imposed by law, it will be upheld. (*Barham* v. *Barham,* 33 Cal.2d 416 [202 P.2d 289]; *Clopton* v. *Clopton,* 162 Cal. 27, 33 [121 P. 720]; *Barker* v. *Barker,* 139 Cal.App.2d 206, 211-212 [293 P.2d 85].) █ Accordingly, the provisions relating to property rights in the antenuptial agreement entered into between the husband and the wife herein are valid.

In *Clopton,* however, there is a clear implication that if an antenuptial agreement relieves the husband from the obligation of supporting and maintaining his wife during the continuance of the proposed marriage relation, it will be held invalid to that extent. And in *Barker,* it was said at pages 211-212: "The agreement itself does not in anywise affect the marital

obligations of either party to support the other, either during marriage or by way of alimony in the event of divorce. It does not deal with the subject of support, or with divorce or alimony, costs, or attorney's fees in event of separation and an action for divorce; it deals solely with property rights. . . .

"Parties contemplating marriage may validly contract as to their property rights, both as to property then owned by them and as to property, including earnings, which may be acquired by them after marriage [citations].

"Appellant relies on *Barham* v. *Barham,* 33 Cal.2d 416 . . . and *Whiting* v. *Whiting,* 62 Cal.App. 157 . . . . Neither of these cases is in point. In neither are antenuptial agreements held invalid. In both cases, only those portions of antenuptial agreements which purported 'o relieve the husband from the obligation to support the wife, or to pay alimony in the event his own wrongdoing terminated the marriage and entitled the wife to alimony, were held against public policy. Clearly, these cases have no application to the contract here."

In a note at 54 Harvard Law Review 473 (1941) at page 478, it was said, with respect to contracts involving marital obligations: "[T]he most frequently litigated incident of the marital status is the duty of the husband to support his wife in accordance with his financial and social position. Any attempt by the parties to diminish or waive this obligation in an antenuptial agreement is unenforceable."

This is the majority rule, as laid down in the following cases, among many others: *Motley* v. *Motley,* 255 N.C. 190 [120 S.E.2d 422, 423-424]; *Hillman* v. *Hillman* (Sup.) 69 N.Y.S.2d 134, affirmed 273 App.Div. 960 [79 N.Y.S.2d 325]; *Kershner* v. *Kershner,* 244 App.Div. 34 [278 N.Y.S. 501, 503-504], affirmed 269 N.Y. 655 [200 N.E. 43]; *French* v. *McAnarney,* 290 Mass. 544 [195 N.E. 714, 715, 98 A.L.R. 530]; *Warner* v. *Warner,* 235 Ill. 448 [85 N.E. 630, 638]; *Ryan* v. *Dockery,* 134 Wis. 431 [114 N.W. 820, 821]; cf. *Parker* v. *Commissioner of Internal Revenue* (9th Cir. 1948) 166 F.2d 364, 368; *Graham* v. *Graham* (E.D.Mich. 1940) 33 F.Supp. 936, 938-939; *Belcher* v. *Belcher* (Fla.) 271 So.2d 7, 9; *Reiling* v. *Reiling,* 1 Ore.App. 571 [463 P.2d 591, 592]; *Volid* v. *Volid,* 6 Ill.App.3d 386 [286 N.E.2d 42, 47]; *Norris* v. *Norris* (Iowa) 174 N.W. 2d 368, 370[4]; *Garlock* v. *Garlock,* 279 N.Y. 337 [18 N.E.2d 521, 522-523, 120 A.L.R. 1331].

As stated in *Ryan* v. *Dockery, supra,* 114 N.W. 820, 821: "Husband and wife may contract with each other before marriage as to their mutual

property rights, but they cannot vary the personal duties and obligations to each other which result from the marriage contract itself."

In California, the support obligation referred to is that existing during the lifetime of the parties; and it has been held that in an antenuptial agreement the wife-to-be may waive a family allowance from the estate of the husband-to-be (*Estate of Schwartz,* 79 Cal.App.2d 308 [179 P.2d 868]) and also that a husband-to-be may waive a family allowance from the estate of the wife-to-be (*Estate of Wamack,* 137 Cal.App.2d 112 [289 P.2d 871]).

In this state, a contract between a husband and wife entered into after the marriage, which contract made no provision for a separation but granted the husband immunity from financial charge whether the parties lived together or apart, has been held to be against public policy. (*Rottman* v. *Rottman,* 55 Cal.App. 624, 634 [204 P. 46].) The right of a husband and wife to contract with each other relating to property and separation is covered by section 4802 of the Civil Code, which reads, in part, as follows: "Except as provided in Section 4811 [relating to property settlement agreements] or subdivision (b) of Section 4801 [relating to support agreements in a proceeding for dissolution of marriage or legal separation], a husband and wife cannot, by any contract with each other, alter their legal relations, except as to property, and except that they may agree, in writing, to an immediate separation, and may make provision for the support of either of them and of their children during such separation or upon the dissolution of their marriage."

Although most of the cases, both in California and elsewhere, deal with a wife's right to support from the husband, in this state a wife also has certain obligations to support the husband. (Civ. Code, §§ 243, 5100, 5132; see *See* v. *See,* 64 Cal.2d 778, 784[14, 15] [51 Cal.Rptr. 888, 415 P.2d 776]; *Livingston* v. *Superior Court,* 117 Cal. 633, 635-636 [49 P. 836].) Section 243 of the Civil Code provides, in part: "Every woman shall support . . . her husband . . . when in need." The duty imposed by section 243 is made subject to the provisions of former section 176 of the Civil Code, now section 5132 of that code. Former section 176, as enacted in 1872, required that a wife support the husband out of her separate property "when he has no separate property and they have no community property, and he from infirmity is not able or competent to support himself." A year later, former section 176 was amended to provide that a husband's right to support thereunder was applicable only if he had not deserted the wife. As enacted by the Legislature in 1970, and now in effect, section 5132, the successor statute, provides, in part: "The wife must

support the husband *while they are living together* out of her separate property when he has no separate property, and there is no community property or quasi-community property and he is unable, from infirmity, to support himself." (Italics added.)

A trial court may in its discretion award to either spouse alimony and support pendente lite (Civ. Code, § 4357), costs and attorney's fees pendente lite (Civ. Code, § 4370), or support following a judgment decreeing a dissolution of marriage or a legal separation of the parties (Civ. Code, § 4801). However, where the husband is unable, from infirmity, to support himself, and he has no separate property and there is no community property or quasi-community property, his right to have the wife support him from her separate property during the time they are living together is not a matter left to the discretion of the trial court; by the terms of section 5132 of the Civil Code the duty of support by the wife under such circumstances is mandatory. Accordingly, to the extent that the husband's obligations were incurred during the time the parties were living together and were reasonably necessary for his support according to the parties' station in life (cf. *Wagner* v. *Wagner,* 104 Cal. 293, 296-297 [37 P. 935]; *Shebley* v. *Peters,* 53 Cal.App. 288, 293 [200 P. 364]; *Wisnom* v *McCarthy,* 48 Cal.App. 697, 701 [192 P. 337]), the wife owes a duty to provide such support.

In the present case, it is unquestioned that the wife has substantial separate property and the ability to provide support for the husband and that the husband had illnesses requiring extensive hospitalization, surgery, and medical attention during the time the parties were living together, the bills for a large part of which were still unpaid at the time of the hearings. Under the circumstances, the trial court erred in refusing to award the husband any support at all covering the period during which the parties were living together. Furthermore, the trial court, acting under the erroneous conviction that the antenuptial agreement precluded an award of post-dissolution support to the husband, failed to exercise its discretion respecting such support; upon remand of this cause the court should exercise its discretion in the matter. (See Civ. Code, § 4801.)

Since under section 5121 of the Civil Code creditors to whom amounts are owing for necessaries provided to the husband while the parties were living together may sue the wife directly and reach certain of her separate property (see *Credit Bureau of Santa Monica Bay Dist., Inc.* v. *Terranova,* 15 Cal.App.3d 854 [93 Cal.Rptr. 538]), the trial court, in the interest of protecting the wife, may, if it sees fit to do so, order payment of the obligations directly to the creditors.

■ Third. *Did the trial court have jurisdiction to enter a final judgment of dissolution of marriage during pendency of the husband's appeal from the interlocutory judgment?*

*No.* The wife contends that under the authority of *In re Marriage of Stuart, supra,* 27 Cal.App.3d 834, the trial court was authorized to enter a final judgment herein even though the husband's appeal from the interlocutory judgment was pending, inasmuch as in his brief he has made no attack on that part of the interlocutory judgment ordering a dissolution of the marriage. *Stuart,* however, does not support the wife's contention. In that matter, as here, the husband did not pursue his appeal from the portion of the judgment ordering the dissolution; but, unlike the situation here, the wife there moved to dismiss the appeal insofar as it purported to be from that portion of the interlocutory judgment which declared that the parties were entitled to have their marriage dissolved, and after her motion was granted, a remittitur was issued directing the trial court to enter a final judgment of dissolution upon proper application of either party, or on the court's own motion, after the expiration of six months from the date the court acquired jurisdiction of the wife. In the present matter, on the other hand, there was no motion to dismiss the appeal insofar as it purported to be from that portion of the interlocutory judgment which declared that the parties were entitled to have their marriage dissolved, and no remittitur issued directing the trial court to enter a final judgment of dissolution. Accordingly, the purported final judgment obtained by the wife during pendency of the husband's appeal from the interlocutory judgment is a nullity.

The judgment is affirmed insofar as it orders a dissolution of the marriage, but in all other respects is reversed and the cause remanded for further proceedings in conformity with the views herein expressed.

Wright, C. J., Tobriner, J., Mosk, J., Burke, J., Sullivan, J., and Clark, J., concurred.