[No. D019029. Fourth Dist., Div. One. Nov. 1, 1993.]

In re CHRISTINA B. et al., Persons Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v.
AGATHA B., Defendant and Appellant.

COUNSEL

Joseph T. Tavano, under appointment by the Court of Appeal, for Defendant and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Susan Strom, Chief Deputy County Counsel and Gary C. Seiser, Deputy County Counsel, for Plaintiff and Respondent.

Patricia L. Davis, under appointment by the Court of Appeal, for Minors.

## OPINION

**KREMER, P. J.**—Agatha B. appeals the juvenile court's order declaring her children Christina and Daniel B. dependents (Welf. & Inst. Code, § 360, subd. (c)), removing them from her physical custody (Welf. & Inst. Code, § 361, subd. (b)(1)), and placing them with their father Walter B. (Welf. & Inst. Code, § 361.2, subd. (b).) She contends the court erred in appointing her a guardian ad litem and in accepting the guardian ad litem's waiver of her due process rights. We agree with the second contention.

## BACKGROUND

Agatha and Walter married in 1979 but later separated. Christina was born July 14, 1982, and Daniel was born October 20, 1985. The family's history includes several child protective service (CPS) referrals.

In 1988, Walter hit Christina with a belt but the investigating social worker determined it was an isolated incident. The case was closed after both parents were counseled. In 1989, there was a report of Agatha's homicidal ideation toward Walter and the children. This case was closed due to insufficient evidence of danger. In 1990, it was reported Agatha used a belt on Christina, Agatha had been diagnosed as paranoid schizophrenic, and she thought someone was going to kill the children. The case was closed due to lack of demonstrable danger. In 1991, there was a report Agatha hit Christina with a brush and wrote letters stating she wanted to beat up neighbors, her husband, and individuals from Rohr Industries. It was determined there was no evidence of danger. In 1992, Agatha sent threatening letters to former employers. The social worker believed she was homicidal and suicidal. The department of social services (DSS) worked with the family under a voluntary contract and Agatha participated in parenting classes.

On February 11, 1993, Christina reported the following abuse occurred on February 1. She was in the bathtub and grabbed a towel from the rack. The rack fell, chipping a soap dish. Christina called for her mother. When Christina reached for another towel some mouthwash fell from the edge of the sink and spilled. Agatha yelled and hit her with her fist. Christina hit her head on the tub and chipped her tooth.

Christina also told social worker Dallas Flemister her mother slapped her in the face and punched her in the shoulder; the usual punishment was spanking with a belt; Agatha had a gun with a lock on it; and she yelled at "things." Christina said she got along well with her mother and her father, whom she saw three to four times a week, and was not afraid to return to her mother.

On February 11, 1993, Daniel told Flemister he got along well with his mother and father whom he saw often. He said he was disciplined by spanking with a belt but did not get many spankings, and Agatha had a gun with a lock on it and yelled sometimes.

On February 11, 1993, the children were detained at Hillcrest Receiving Home (Hillcrest).

On February 12, 1993, Flemister interviewed Agatha. Concerning the February 1 incident, Agatha said she went to the bathroom to wash Christina's back, Christina reached for the towel rack, and the towel knocked the soap dish and chipped it. Agatha told Christina to be more responsible and not to worry. Christina grabbed another towel and knocked over a bottle of mouthwash. Agatha cleaned up the mouthwash and tapped the back of Christina's head with three fingers. Agatha was remorseful and took Christina to the dentist the following day.

Agatha admitted to Flemister she had a gun but said it was always locked and she kept it by her side with the key pinned to her bra. She got the gun because Walter had threatened her; neighbors and county employees had also threatened her. When Walter punched her, she told him to get out or she would shoot. She said someone was pulling strings and she had called an FBI agent to have him check on the children at Hillcrest. She also mentioned the CIA, and said she had clearances from all agencies and could save Flemister the time it would take him to check her clearances and criminal record.

Flemister interviewed Walter on February 12, 1993. Walter said he wanted Agatha to get help and stabilize; she was a good mother when she was stable and took her medication. He had contact with the children three to five times a week. He wanted them to be safe and out of Hillcrest, and could provide them with a temporary home until he applied for Aid to Families of Dependent Children and got a bigger place. Agatha had pulled the gun on Walter, but he did not think she would harm him or the children with it.

On February 16, 1993, DSS filed petitions under Welfare and Institutions Code section 300, subdivision (a) with respect to Christina and section 300, subdivision (j) with respect to Daniel. The petitions set forth the February 1 bathtub incident. On February 16, the court ordered the children detained with Walter and a psychological evaluation and supervised visits for Agatha.

Psychologist Victor Frazao evaluated Agatha on February 27, 1993. Agatha claimed Christina's tooth was decalcified and would have broken easily, sought to minimize her own actions, and said she had told the social worker that Christina had a habit of lying. She admitted hitting Christina with a racket but blamed the children and others for her own problems with the children. Dr. Frazao concluded Agatha's intelligence quotient was in the bright normal range and her language development was strong, but she was suspicious and defensive, her thinking was distorted, and she suffered from paranoid schizophrenia. He recommended supervised visitation, parenting classes, counseling, and an evaluation for medication to help her deal with stress.

## Appointment of the Guardian Ad Litem

On March 30, 1993, Agatha's attorney requested a guardian ad litem be appointed for her. The court set a hearing for April 19.

At the outset of the April 19, 1993, hearing the court stated:

"[T]he court needs to find one of the following in order to appoint a guardian ad litem for the mother: the court needs to find either that the mother lacks the capacity to understand the nature or consequences of the juvenile court proceeding, or that she is unable to assist her attorney in the preparation of her case.

"The standard will be a preponderance of the evidence . . . ."

Agatha submitted to the court her own self-evaluation rebutting that of Dr. Frazao, letters, and a stipulated order from family court services. She testified concerning three newspaper clippings[1] which she submitted to the court to show her "knowledge of reality versus reality." The first clipping, entitled "For Three Dollars, Barbie Tells Special Secrets," concerned a Barbie doll collector who could speak for all the Barbie dolls in the world and claimed she could tell special secrets through her dolls. Agatha noted this woman was "unique and eccentric" and commented: "And obviously, well, if an inanimate object can speak, extrinsically I would be interested." She concluded: "So we know that this is her reality. But under normal circumstances and in that average population or the normal population, this is bogus propaganda."

The second clipping, "They're Eyes, Ears for Cops in Beat 515," discussed a network of civilian criminologists with psychic abilities who report criminal activities in their neighborhoods to assist local authorities. Agatha said she was part of the network and had made contact on several occasions with the group's spokesperson. The spokesperson had tried to track her for several years as a test of the tracking system but she had evaded him.

The third article, "C.I.A. to Let Public in on Secrets of Learning a New Language Fast," was published to teach proper communication. Agatha explained: "And this is also reality. And this also affects everyone environmentally inner and outer space or intrinsically and extrinsically speaking." She concluded: "And what I wanted to point out here is that, and this is only documenting the proof of what I was trying to tell people who were trying to tell me I was crazy, and I suggested and urged them that I was not and that I can get proof from Washington, D.C., and I have."

Agatha told of a widespread conspiracy against her of which the dependency proceeding was a part. Among other things, her apartments had been

---

[1]None of the documents Agatha submitted to the juvenile court were entered into evidence and they are not part of the record on appeal.

broken into, her fashion designs had been stolen, and she had been spied upon. She suffered only from stress and physical difficulties. She had been given haloperidol as a tranquilizer but she did not have to take medication because it caused side effects; the doctors had okayed this.

Agatha testified she understood DSS had filed petitions as to both Christina and Daniel and there was going to be a trial. The following then occurred:

"THE COURT: And what do you think is going to happen at that trial?

"THE MOTHER: I think that we're going to have an equitable hearing, and both sides are going to be listened to, and I think that one consideration that —well, there were a lot of considerations that were not provided me that were provided my husband, which shows me that there has already been bias. It's part of what all this other inter-relational stuff is involving.

"MR. TRAVIS [Agatha's counsel]: It's part of the conspiracy you told me about last week?

"THE MOTHER: Previously leading up to this whole thing."

Agatha said she understood the purpose of the trial was for the court to determine if the petitions were true, county counsel had the obligation to present evidence they were true, and she had the right to argue anything she felt was fabricated or incorrect. The following dialogue then occurred:

"THE COURT: You have a right to present evidence on your behalf. And you've also got certain trial rights which means that you would have a right to see and hear any witnesses that might be called to testify.

"THE MOTHER: Yes.

"THE COURT: You'd also have a right to have Mr. Travis ask them questions. You'd have a right to present evidence on your behalf. You'd have a right to do that by way of asking witnesses to come and testify for you. Do you understand that?

"THE MOTHER: Yes, sir.

"THE COURT: Do you understand what would happen if they didn't want to come in?

"THE MOTHER: It would just confirm my conspiracy theory.

"     .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"THE COURT: . . . Do you understand what would happen if the court were to make a true finding of the petitions?

"THE MOTHER: Yes, sir.

". . . . . . . . . . . . . . . . . . . . . . . . . .

"THE COURT: Well, the petition relates to several things. It relates to whether or not you've subjected Christina to serious physical harm, or whether there is a risk that she would be subjected to serious physical harm with you.

"THE MOTHER: Right. . . ."

Agatha testified she perceived Mr. Travis's role as being her "representative on [her] behalf and in [her] favor" and she would assist him. The court noted she had already provided counsel with much information and asked her if she believed that information was related to the issues raised by the petitions. Agatha responded: "Everything that is documented is relational to what has transpired or occurred up into the present. And being one of the key issues, marital problems, separation effects on the children, effects on me, environmental occurrences because of it and so forth are all relevant and tie into the case." She then launched into a discussion of the conspiracy. She referred to reports she had obtained from the FBI and the CIA stating there were no criminal records or reports on her.

At the conclusion of the hearing, the court took the matter under submission. On April 30, 1993, it found Agatha was unable to assist counsel in preparing her case and appointed Attorney Terence Chucas as guardian ad litem.

FURTHER PROCEEDINGS

On April 28, 1993, social worker Flemister received a voice mail message from Agatha stating Walter was "having the neighbors hump the children for money."

On April 28, 1993, psychiatrist Herbert Hurwitz evaluated Agatha. She related her conspiracy theory to him at length. He stated: "[Agatha] was extremely difficult to interview because of an extreme degree of verbosity from which she could not be focused. She provided obsessively irrelevant details of more and more minutiae and would have gone on rambling at great length without responding to questions had not the interviewer restructured

the interview continuously. Even though I attempted to focus and refocus my questions, she did not respond and instead provided ongoing extreme detail, almost portraying events of her life on a real time, moment by moment basis." Dr. Hurwitz found Agatha was of at least average intelligence but suffered from a chronic paranoid delusional disorder or chronic paranoid schizophrenia. Her symptoms included thought disorder, delusional ideas, disturbed interpersonal behaviors and manner, severe denial, and projection on others of problems and difficulties. He concluded her prognosis was poor and she was not safe as an independent custodial parent or an unsupervised visitor.

According to the May 3, 1993, social study, Walter said he had let Agatha spend the night at his home. Christina told him Agatha had asked her "Has daddy ever made you suck his dick?" The children's therapist reported that Agatha told Daniel she had dreamed he had sucked a dog's penis. Walter said Agatha and the children had moved a lot because she was "always yelling." Agatha did not see the need for medication.

At the May 3, 1993, jurisdictional hearing, the guardian ad litem, over Agatha's objection, waived her trial rights and submitted the matter on the social worker's reports. The court found the petitions true.

At the May 17, 1993, dispositional hearing, Agatha's counsel stated she had discussed the matter with the guardian ad litem and that Agatha submitted on the social worker's recommendations. The court declared the children dependents, removed them from Agatha's custody, placed them with Walter, and ordered Agatha comply with the reunification plan.

## DISCUSSION

### I

Agatha asserts the court erroneously adjudged her incompetent by applying Penal Code section 1367,[2] the test for mental competence to stand trial in criminal proceedings, rather than Probate Code section 1801,[3] the test for appointing a conservator, under which test a guardian ad litem would not

---

[2]Penal Code section 1367, subdivision (a) states: "A person cannot be tried or adjudged to punishment while that person is mentally incompetent. A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."

[3]Probate Code section 1801, subdivision (a) permits the appointment of a conservator "for a person who is unable properly to provide for his or her personal needs for physical health, food, clothing, or shelter."

have been appointed. She argues even under the Penal Code section 1367 test, she clearly knew the nature and consequences of the dependency proceeding and was capable of presenting her case.

Code of Civil Procedure section 372 provides in pertinent part: "When a minor, an incompetent person, or a person for whom a conservator has been appointed is a party, such person shall appear either by a guardian or conservator of the estate or by a guardian ad litem appointed by the court in which the action or proceeding is pending, or by a judge thereof, in each case. A guardian ad litem may be appointed in any case when it is deemed by the court in which the action or proceeding is prosecuted, or by a judge thereof, expedient to appoint a guardian ad litem to represent the minor, incompetent person, or person for whom a conservator has been appointed, notwithstanding that such person may have a guardian or conservator of the estate and may have appeared by the guardian or conservator of the estate. The guardian or conservator of the estate or guardian ad litem so appearing for any minor, incompetent person, or person for whom a conservator has been appointed shall have power, with the approval of the court in which the action or proceeding is pending, to compromise the same, to agree to the order or judgment to be entered therein for or against the ward or conservatee, and to satisfy any judgment or order in favor of the ward or conservatee or release or discharge any claim of the ward or conservatee pursuant to such compromise."

In *In re R.S.* (1985) 167 Cal.App.3d 946 [213 Cal.Rptr. 690], the appellant contended the trial court erred in failing to appoint her a guardian ad litem and counsel was ineffective in failing to request her competency be evaluated. (*Id.* at p. 978.) The reviewing court noted: "Counsel for the parties have not cited and we have not discovered any judicial explication of the minimum standard of competency that triggers the necessity of appointment of a guardian ad litem." (*Ibid.*) In rejecting the appellant's contentions it noted:

"[The appellant] did understand the nature of the proceedings against her and was able to meaningfully participate in those proceedings and to cooperate with her trial counsel in representing her interest.

"We therefore conclude that neither the trial court nor [appellant's] trial counsel ignored evidence that [appellant's] abilities were so limited that she was effectively rendered incompetent to understand the nature of the proceedings or to assist her counsel in representing her interest so as to require appointment of a guardian ad litem." (167 Cal.App.3d at pp. 979-980.) Thus, the court in *In re R.S.* used the language of Penal Code section 1367.

In *In re Lisa M.* (1986) 177 Cal.App.3d 915 [225 Cal.Rptr. 7], the reviewing court also used this language. There, the juvenile court expressly

found the appellant was incapable of understanding the dependency proceedings. The appellate court held: "That knowledge alone should have triggered some action—either by [appellant's] own counsel, her parents, the district attorney or by the court itself—to obtain appointment of a guardian ad litem, . . ." (*Id.* at p. 919.)

Probate Code section 1801, on the other hand, pertains to an individual's ability to provide material needs. It does not speak at all to the court's concern in a case such as the instant one: whether the person in question is able to take part meaningfully in the proceedings. The cases cited above articulate a standard which, unlike Probate Code section 1801, focuses on the ability to participate in court proceedings.

We conclude the juvenile court here applied the proper standard in appointing the guardian ad litem.[4] ■ We must next consider whether the appointment was proper under this standard. For this purpose it is sufficient that we determine whether the record supports the juvenile court's determination Agatha was unable to assist counsel in the conduct of the case.

The transcript of the April 19, 1993, hearing demonstrates Agatha's inability to differentiate the dependency case from the larger conspiracy she believed was being conducted against her. The record is replete with examples of her rambling and failure to focus on the matter at hand. Her trial attorney noted:

"Your honor, as the court might be able to realize by now, one of the problems I've had is the mother's had—there's apparently been a conspiracy against her. And my dealings with the mother have been in dealing with a lot of that conspiracy. And it's very difficult, in fact, virtually impossible, to have focused on this very narrow bit what's happening in juvenile dependency court.

"And I know the court has tried to focus my client on what's happening here, but I've had virtually no luck in focusing on this particular aspect. And we were in my office for over an hour last week and that's where she gave me the clippings, and we went into details. But I was unable to focus on what we were going to do for the trial."

The record shows Agatha was unable to assist her attorney in the conduct of the case. The juvenile court did not err in appointing a guardian ad litem.

---

[4] We disagree with Agatha that application of the Penal Code section 1367 standard would require the juvenile court to suspend proceedings until she became competent. First, no statute or case so requires. Second, to suspend the proceedings would be completely at odds with the intent of the juvenile court to look after the children's best interests. These interests require an expeditious resolution of dependency cases.

## II

■■ Agatha argues the court erred in accepting the guardian ad litem's waiver of her right to a trial over her objection. She relies primarily on *Berry v. Chaplin* (1946) 74 Cal.App.2d 652 [169 P.2d 442].

In *Berry*, the guardian ad litem of an unborn child brought a paternity action against the defendant. (74 Cal.App.2d at p. 653.) The guardian ad litem, the defendant, and the child's mother entered into a stipulation providing that if blood tests showed the defendant was not the father, the action would be dismissed with prejudice. (*Id.* at pp. 653-657.) Although blood tests subsequently showed the defendant was not the father, the guardian ad litem refused to dismiss the action and the trial court denied the defendant's motion to dismiss. (*Id.* at p. 654.) The reviewing court concluded the trial court had properly denied the dismissal motion because the guardian ad litem's limited powers did not include the power to enter into the stipulation, and the trial court had no power to approve it. (*Id.* at pp. 657, 661.) The court stated:

"A minor, who must of necessity appear by his guardian, is not bound by the admissions of the guardian which mean the sacrifice or giving away of the ward's property. [Citations.] The relationship between a guardian ad litem or the attorney whom he employs and the minor is not the same as that between an attorney and an adult client. It is the duty of the guardian and the attorney to protect the rights of the minor, and it is the duty of the court to see that such rights are protected. The court may set aside or disregard concessions of the guardian which have not already been judicially approved and which are shown to the court to have been improvidently made. Any acts or concessions that apparently waive or surrender any material right of the minor, such as the right to a trial, should be set aside unless they be shown to be beneficial or, in any event, not prejudicial to the rights and interests of the minor. [Citation.] The appointment of a guardian ad litem is not a bare technicality and the office of a guardian involves more than perfunctory or shadowy duties. It is the duty of a guardian ad litem to protect or defend a suit, as the case may be. The guardian ad litem can neither admit anything against nor waive anything in favor of his ward, but the adversary of the infant must be required to prove his whole case. [Citations.]

"  . . . . . . . . . . . . . . . . . . . . . . .

"Neither the guardian ad litem nor the attorneys for the minor, nor both, had power to consent to a judgment depriving the minor of its right to claim support from defendant without the opportunity of a trial at which all

available evidence could be introduced for consideration by the jury, not merely such evidence as the parties considered proper for the determination of the issue involved." (74 Cal.App.2d at pp. 657-658, italics omitted.)

Respondent cites *Cloud* v. *Market Street Ry. Co.* (1946) 74 Cal.App.2d 92 [168 P.2d 191], a wrongful death case. There, the court held that while a guardian ad litem "cannot prejudice the substantial rights of a minor by any admissions, waivers or stipulations . . . [t]his rule is not . . . carried to the extent of depriving the guardian ad litem . . . of the power to bind the minor in the merely procedural steps incident to the conduct of the litigation. . . . [and] [¶] 'does not prevent a guardian ad litem . . . from assenting to such arrangements as will facilitate the determination of the case in which the rights of the infant are involved.'" (*Id.* at p. 101, citations and italics omitted.) The court noted: "The question whether to demand a jury trial or waive one and try the case to the court is one of trial tactics and procedure only, and the waiving of a jury trial does not in any sense affect the substantial rights of a party." (*Id.* at p. 102.) Thus, the case stands for the proposition a guardian ad litem may waive the right to a jury trial; not that such a guardian is wholly free to waive trial altogether. (*Id.* at pp. 101-103.)

■ A guardian ad litem is not a party to the action, but merely a party's representative (*In re Marriage of Higgason* (1973) 10 Cal.3d 476, 484 [110 Cal.Rptr. 897, 516 P.2d 289], overruled on other grounds by *In re Marriage of Dawley* (1976) 17 Cal.3d 342, 352 [131 Cal.Rptr. 3, 551 P.2d 323]; *Sarracino* v. *Superior Court* (1974) 13 Cal.3d 1, 13 [118 Cal.Rptr. 21, 529 P.2d 53]; *J.W.* v. *Superior Court* (1993) 17 Cal.App.4th 958, 964 [22 Cal.Rptr.2d 527]), an officer of the court (*Torres* v. *Friedman* (1985) 169 Cal.App.3d 880, 887 [215 Cal.Rptr. 604]). " 'He is like an agent with limited powers.' " (*Berry* v. *Chaplin, supra,* 74 Cal.App.2d at p. 657, quoting *Cole* v. *Superior Court* (1883) 63 Cal. 86, 89.) "The duties of a guardian ad litem are essentially ministerial." (*Dacanay* v. *Mendoza* (9th Cir. 1978) 573 F.2d 1075, 1079.)

The guardian ad litem's purpose is to protect the rights of the incompetent person. (Cf. *De Los Santos* v. *Superior Court* (1980) 27 Cal.3d 677, 683 [166 Cal.Rptr. 172, 613 P.2d 233].) He or she has the right to control the litigation on behalf of the incompetent person. (Cf. *ibid.*) "Among his powers are the right to compromise or settle the action (Code Civ. Proc., § 372), to control the procedural steps incident to the conduct of the litigation (*Cloud* v. *Market Street Ry. Co.* (1946) 74 Cal.App.2d 92, 101-103 [168 P.2d 191]), and, with the approval of the court, to make stipulations or concessions that are binding on the [incompetent], provided they are not prejudicial to the latter's

interests (*Robinson* v. *Wilson* (1974) 44 Cal.App.3d 92, 99-107 [118 Cal.Rptr. 569])." (*De Los Santos* v. *Superior Court, supra*, 27 Cal.3d at p. 684.)

Read in light of *Berry* v. *Chaplin, supra*, 74 Cal.App.2d 652, these cases teach that a guardian ad litem's role is more than an attorney's but less than a party's. The guardian may make tactical and even fundamental decisions affecting the litigation but always with the interest of the guardian's charge in mind. Specifically, the guardian may not compromise fundamental rights, including the right to trial, without some countervailing and significant benefit. ■■■ While an analysis of prejudice would often be called for when considering the effect of an inappropriate waiver of procedural rights, we believe no such analysis is required where, as here, the right to a hearing itself has been abandoned by the guardian ad litem (see *Spector* v. *Superior Court* (1961) 55 Cal.2d 839, 844 [13 Cal.Rptr. 189, 361 P.2d 909]).

Here, at the jurisdictional hearing, the guardian ad litem, over Agatha's objection, waived her rights to a court trial and to confront, cross-examine, and subpoena witnesses; waived her privilege against self-incrimination; and submitted the matter on the social worker's reports and attachments. Agatha says this amounts to consent to her children's removal from her custody.

While Agatha's lawyer was not deprived of the opportunity to argue the significance of the evidence or for a particular disposition, the juvenile court was not relieved of its duties to weigh the evidence and Agatha was not deprived of the ability to appeal based on the sufficiency of the evidence (*In re Tommy E.* (1992) 7 Cal.App.4th 1234, 1237 [9 Cal.Rptr.2d 402]); nevertheless, we believe the waiver exceeded the scope of the guardian ad litem's powers and the court erred in accepting it. Rather than protecting or benefiting Agatha, the waiver operated to deprive her of fundamental constitutional rights to a hearing with no countervailing benefit. This was no mere matter of procedure. While we uphold the court's use of an analogue to Penal Code section 1367 to appoint the guardian ad litem, we are aware the parent in a dependency case does not have the same protections as a criminal defendant declared incompetent, such as a jury trial on the issue of competence and the suspension of proceedings until competence is regained. These factors militate in favor of narrowly construing the guardian ad litem's powers.

Furthermore, while the juvenile court properly found Agatha was unable to assist counsel in preparing her case, the record fails to show she was incapable of expressing her wishes and exercising the judgment necessary to determine whether to waive her trial rights. (Cf. *Marriage of Higgason, supra*, 10 Cal.3d at p. 483.) It was her prerogative to decline to waive her rights and it was not within the province of her guardian ad litem, her

attorney, or the court to force the waiver upon her. (Cf. *Cohen* v. *Cohen* (1946) 73 Cal.App.2d 330, 335 [166 P.2d 622].)

The juvenile court erred in accepting the guardian ad litem's waiver of Agatha's trial rights. Accordingly we reverse the jurisdictional and dispositional orders.

DISPOSITION

The jurisdictional and dispositional orders are reversed.

Work, J., and Todd, J., concurred.