[S.F. No. 23418. June 29, 1976.]

In re the Marriage of BETTY J. and JAMES R. DAWLEY.
JAMES R. DAWLEY, Respondent, v.
BETTY J. DAWLEY, Appellant.

**COUNSEL**

Bourhis & Bourhis, Barbara Lawless Bourhis and Randall D. Reedy for Appellant.

Larry A. Ramsey for Respondent.

## OPINION

**TOBRINER, J.**—The present case involves the validity of an antenuptial contract in which the parties agreed that their earnings and other property acquired during the marriage would be held as separate property. At the time they entered the agreement, the parties anticipated the early dissolution of their marriage. Relying on *In re Marriage of Higgason* (1973) 10 Cal.3d 476 [110 Cal.Rptr. 897, 516 P.2d 289], which stated in dictum that an antenuptial agreement "must be made in contemplation that the marriage relation will continue until the parties are separated by death" (p. 485), the wife contends that the agreement violates public policy.

We shall point out that the quoted language from *Higgason* does not accurately state California law. Our decisions, including *Higgason* itself, do not hold an agreement void if the parties contemplated dissolution; they hold it void only insofar as the terms of the agreement itself promote the dissolution of the marriage. The test of the validity of the contract thus does not turn on the subjective contemplation of the parties—a standard which would make it impossible to rely on any antenuptial agreement—but upon the objective language of the contract itself. Applying that test, we conclude that the agreement at bar, which provides that the parties will hold their earnings as separate property, does not offend public policy.

We reject also the wife's other contentions. We shall explain that substantial evidence supports the trial court's implied finding that the agreement was not procured by undue influence; that the conduct of the parties negates her claim that they rescinded the antenuptial agreement; and that, pursuant to the terms of the agreement, a boat, for which the husband paid the downpayment but both spouses signed a loan for the balance of the price, is the separate property of the husband.

1. *Summary of facts.*

Betty Johnson, a tenured elementary school teacher, and James Dawley, an engineer, met in 1961 and maintained an intimate relationship until March of 1964. On May 11, 1964, Betty went to James'

residence to pick up her belongings, but following a long and emotional discussion they agreed to resume their relationship. Two weeks later Betty discovered that she was pregnant.

Betty told James that she feared a nonmarital pregnancy would result in her losing her teaching job. An acrimonious exchange ensued, during which Betty claims James refused to help her, and James claims she threatened him with a paternity suit accompanied by publicity intended to imperil James' employment. Finally, both agreed to a temporary marriage as a solution to their dilemma.

James insisted on an antenuptial agreement to protect his property and earnings from Betty's claims; she insisted that he agree to support Carolyn, her daughter from a previous relationship, and herself for the period of her pregnancy and thereafter until she could resume teaching duties. James and Betty agreed to ask Michael diLeonardo, James' attorney, to draft the agreement. Betty reviewed the contract with her attorney, and accepted its provisions. They signed the agreement on June 11, 1964, and married two days later.

The antenuptial agreement, the complete text of which appears in footnote,[1] provided in paragraphs V and VI that all property, including

---

[1]The antenuptial agreement reads as follows: "THIS AGREEMENT is entered into on the 11 day of June, 1964, by and between JAMES R. DAWLEY and BETTY JEAN CALVERT JOHNSON. [¶] This agreement is made with reference to the following facts: [¶] JAMES R. DAWLEY and BETTY JEAN CALVERT JOHNSON are contemplating marriage. [¶] II JAMES R. DAWLEY is the owner of real and personal property set forth and described in Exhibit "A" attached to this agreement and by this reference thereto made a part hereof as though fully set forth. [¶] III BETTY JEAN CALVERT JOHNSON is the owner of real and personal property set forth and described in Exhibit "B" attached this agreement and by this reference thereto made a part hereof as though fully set forth. [¶] IV JAMES R. DAWLEY has two children of a former marriage, whose names are: Katherine June Dawley and James R. Dawley. [¶] V The parties desire to define the respective rights of each in the property of the other after marriage, and the parties desire that all property owned by either of them at the time of the marriage and property purchased by either of them from their own earnings during the marriage, shall be their respective separate property. [¶] VI (a) BETTY JEAN CALVERT JOHNSON agrees that all property of any nature or in any place, including but not being limited to the earnings and income resulting from his personal services, skill, effort, and work, belonging to JAMES R. DAWLEY at the commencement of the marriage or acquired by or coming to JAMES R. DAWLEY by purchase, gift or inheritance during the marriage, shall be his separate property, and shall be enjoyed by him and shall be subject to his disposition as his separate property in the same manner as though the proposed marriage had never been entered into. BETTY JEAN CALVERT JOHNSON acknowledges that she understands that, except for this agreement, the earnings and income resulting from the personal services, skill, effort, and work of JAMES R. DAWLEY after the marriage would be community property, but that by this

earnings, belonging to either spouse at the commencement of marriage or acquired by him through purchase, gift or inheritance during marriage would be owned by that spouse as his separate property. Each spouse disclaimed all rights, including community property rights, in the property of the other spouse. James agreed in paragraph VIII to support Betty and Carolyn "for the minimum period of fourteen calendar months following said marriage, in order that [Betty] may take a leave of absence from the teaching profession for said period"; in paragraph IX he agreed to support any child born to Betty in the next ten months until the child reached majority.[2]

---

agreement such earnings and income are made his separate property. [¶] (b) JAMES R. DAWLEY agrees that all property of any nature or in any place, including but not being limited to the earnings and income resulting from her personal services, skill, effort, and work, belonging to BETTY JEAN CALVERT JOHNSON at the commencement of the marriage or acquired by or coming to BETTY JEAN CALVERT JOHNSON by purchase, gifts or inheritance during the marriage, shall be her separate property and shall be enjoyed by her and shall be subject to her disposition as her separate property in the same manner as though the proposed marriage had never been entered into. JAMES R. DAWLEY acknowledges that he understands that, except for this agreement, the earnings and income resulting from the personal services, skill, effort, and work of BETTY JEAN CALVERT JOHNSON after the marriage would be community property, but that by this agreement such earnings and income are made her separate property. [¶] VII (b) BETTY JEAN CALVERT JOHNSON hereby relinquishes, disclaims, releases, and forever gives up any and all right, claim, or interest in or to the property of JAMES R. DAWLEY including but without being limited to community property rights, rights as an heir or widow, rights to family allowance, rights in case of death, or right to act as administratrix of the estate of JAMES R. DAWLEY. [¶] (b) JAMES R. DAWLEY hereby relinquishes, disclaims, releases, and forever gives up any and all right, claim, or interest in or to the property of BETTY JEAN CALVERT JOHNSON including but without being limited to community property rights, rights as an heir or widower, rights of family allowance, rights in case of death, or right to act as administrator of the estate of BETTY JEAN CALVERT JOHNSON. [¶] VIII JAMES R. DAWLEY agrees, that at all events, if he and BETTY JEAN CALVERT JOHNSON are married, he will support BETTY JEAN CALVERT JOHNSON and her daughter, Carolyn Kaye, in the same manner to which they are now accustomed, for the minimum period of fourteen calendar months following said marriage, in order that BETTY JEAN CALVERT JOHNSON may take a leave of absence from the teaching profession for said period. [¶] IX JAMES R. DAWLEY further agrees that in the event that a child or children is or are born to BETTY JEAN CALVERT JOHNSON during the next ten calendar months, he will pay to said BETTY JEAN CALVERT JOHNSON or to a legally appointed guardian or trustee for such child or children, a reasonable amount each month during the minority of said child or children for the support and education thereof. It is understood that except for the fourteen months above described JAMES R. DAWLEY has no legal or financial responsibility for Carolyn Kaye Johnson unless he so chooses. [¶] X It is expressly agreed by and between the parties hereto that the various provisions contained in this agreement are severable. If any provision of this agreement is held to be invalid or unenforceable all other provisions shall nevertheless continue in full force and effect."

[2]diLeonardo testified that he did not recall drafting paragraphs VIII and IX of the agreement. These paragraphs may have been drafted by Betty or her attorney, but the record is not clear on the matter.

Lisa Dawley, the parties' daughter, was born in January of 1965. The 14-month period mentioned in the agreement expired in September of 1965 when Betty resumed her teaching duties. The parties, however, did not separate at that time, but continued to live together until July of 1972.[3]

In April of 1973, James filed for dissolution of the marriage. The trial court granted the dissolution, and awarded Betty spousal support of $1 per year, custody of Lisa with support of $300 per month, and $1,000 in attorney's fees. Relying on the antenuptial agreement, the court found no community property subject to division in the dissolution action, and awarded James all property purchased with his separate income. Betty appeals from the court's failure to find the existence of and to divide community property.[4]

2. *The antenuptial agreement does not offend the policy against contracts which encourage or promote the dissolution of a marriage.*

Pursuant to Civil Code sections 5133 through 5137, " '[p]arties contemplating marriage may validly contract as to their property rights, both as to property then owned by them and as to property, including earnings, which may be acquired by them after marriage.' " (*In re Marriage of Higgason, supra,* 10 Cal.3d 476, 486, quoting *Barker* v. *Barker* (1956) 139 Cal.App.2d 206, 212 [293 P.2d 85].) Betty concedes that the agreement between James and herself conforms to the statutory requirements governing antenuptial agreements.

Betty contends, however, that the agreement is entirely invalid because uncontradicted evidence shows that it was not entered into in contemplation of a marriage to last until death. She relies for this proposition upon a sentence taken from our opinion in *Marriage of Higgason, supra,* in which we stated that an antenuptial agreement "must be made in contemplation that the marriage relation will continue until the parties are separated by death." (10 Cal.3d 476, 485.) We shall explain, however, that the quoted language from *Higgason* does not accurately reflect California law. Enforcement of the state policy

---

[3]We discuss the financial transactions of the parties during their marriage in connection with parts 3, 4, and 5 of this opinion.

[4]The notice of appeal states that Betty appeals from that portion of the interlocutory judgment adverse to her. Her briefs on appeal, however, only discuss the subject of division of property; we infer that she does not view the court's orders respecting dissolution, child support, or alimony as adverse to her interests.

to foster and protect marriage (see *Hill* v. *Hill* (1943) 23 Cal.2d 82, 93 [142 P.2d 417]) does not require the invalidation of entire agreements based upon the subjective contemplation of the parties; it requires only that the courts refuse to enforce specific contractual provisions which by their terms seek to promote the dissolution of a marriage.

From *Loveren* v. *Loveren* (1895) 106 Cal. 509 [39 P. 801] to the most recent decision of this court on the matter, *Glickman* v. *Collins* (1975) 13 Cal.3d 852 [120 Cal.Rptr. 76, 533 P.2d 204], California courts have uniformly held that contracts offend the state policy favoring marriage only insofar as the terms of the contract "facilitate," "encourage," or "promote" divorce or dissolution.[5]

■ ■■■■ Apart from *Higgason,* no case has distinguished, in terms of the policy favoring marriage, between antenuptial agreements and those executed during a viable marriage,[6] and none have asserted that only agreements made in contemplation of a lifelong marriage are valid. The cases have uniformly directed their inquiry not to the subjective contemplation of the parties, but to the objective terms of the contract, and the effect of those terms in promoting the dissolution of the marriage.

Indeed *Higgason* itself exemplifies this objective approach to ascertaining the validity of agreements. In *Higgason* a wealthy 73-year-old woman married a man, age 48, without financial resources. Prior to the marriage they executed an agreement under which each waived all interest in the property of the other and all right to support. In the

---

[5]See *Glickman* v. *Collins, supra,* 13 Cal.3d 852, 857; *Barham* v. *Barham* (1949) 33 Cal.2d 416, 428 [202 P.2d 289]; *Pereira* v. *Pereira* (1909) 156 Cal. 1, 4-5 [103 P. 488]; *Newman* v. *Freitas* (1900) 129 Cal. 283, 289 [61 P. 907]; *Loveren* v. *Loveren, supra,* 106 Cal. 509, 512; *Estate of Nelson* (1964) 224 Cal.App.2d 138, 142 [36 Cal.Rptr. 352]; *Whiting* v. *Whiting* (1923) 62 Cal.App. 157, 165 [216 P. 92]; *McCahan* v. *McCahan* (1920) 47 Cal.App. 173, 175 [190 P. 458].

Although the cited cases assert that an agreement which "facilitates" dissolution violates public policy, this terminology is misleading. In a literal sense, any contract which delimits the property rights of the spouses might "facilitate" dissolution by making possible a shorter and less expensive dissolution hearing. But public policy does not render property agreements unenforceable merely because such agreements simplify the division of marital property; it is only when the agreement encourages or promotes dissolution that it offends the public policy to foster and protect marriage.

[6]Married couples may freely contract to alter the separate or community status of their property (see Civ. Code, § 5103), but unless the marriage relationship has irreparably broken down, so that the legitimate objects of matrimony have been utterly destroyed, an agreement which promotes divorce violates public policy. (*Glickman* v. *Collins, supra,* 13 Cal.3d 852, 857; *Hill* v. *Hill, supra,* 23 Cal.2d 82, 93.)

subsequent dissolution action the husband challenged the validity of the agreement.

Although our opinion in *Higgason* asserted that a valid antenuptial agreement must be made in contemplation of a marriage lasting until death, we did not attempt to determine what the parties actually contemplated at the time of the execution of the agreement. Instead, the opinion proceeds directly to examine the *terms* of the contract. Upholding the husband's waiver of property rights, we stated that "Insofar as an antenuptial agreement relates to the disposition of the property of the respective parties, and does not seek to alter support obligations imposed by law, it will be upheld. [Citations.] Accordingly, the provisions relating to property rights in the antenuptial agreement entered into between the husband and the wife herein are valid." (10 Cal.3d 476, 485.) Relying, however, on decisions invalidating a wife's waiver of support rights because it promoted divorce, we held the same principle barred enforcement of the husband's waiver of support rights.

Turning to the cases preceding *Higgason*, we find no decision which struck down a contract which merely provided that the earnings and accumulations of each spouse will be held as separate property. On two occasions courts held invalid as promotive of divorce provisions which waived or limited rights of spousal support, yet enforced property divisions contained in the same agreement. (*Barham* v. *Barham, supra,* 33 Cal.2d 416, 428; *Whiting* v. *Whiting, supra,* 62 Cal.App. 157; see discussion in *Barker* v. *Barker, supra,* 139 Cal.App.2d 206, 212.) The few decisions striking down property provisions have all involved contracts in which those provisions were inseverably linked to other terms which waived or limited rights to support or attorney's fees. (*Pereira* v. *Pereira, supra,* 156 Cal. 1 ($10,000 consideration in settlement of support and alimony claims); *Estate of Nelson, supra,* 224 Cal.App.2d 138 (waiver of all property and support rights in contract procured by undue influence).)

Our disagreement with *Higgason*'s dictum that parties to an antenuptial agreement must contemplate a lifelong marriage, however, is not merely a matter of adherence to precedent. A rule measuring the validity of antenuptial agreements by the subjective contemplation of the parties hazards the validity of all antenuptial agreements. No agreement would be safe against the risk that a spouse might later testify that he or she anticipated a marriage of short duration when he or she executed the agreement. Disputes concerning the validity of the agreement may arise,

moreover, many years after its execution, perhaps even after the death of the parties, thus rendering any attempt to reconstruct the subjective anticipation of the parties fruitless. In consequence, under a test based upon the subjective contemplation of the parties, neither persons dealing with the parties nor even the parties themselves could rely on the terms of an antenuptial agreement.

Further uncertainties arise from the inherent vagueness of any test based on the subjective contemplation of the parties. A man and woman entering into marriage may pledge their faith "til death do us part," but the unromantic statistics show that many marriages end in separation or dissolution. Spouses who enter into an antenuptial agreement cannot forecast the future; they must, as a realistic matter, take into account both the possibility of lifelong marriage and the possibility of dissolution. In consequence a dichotomous test which insists that the contracting parties must contemplate either a marriage until death or an earlier termination is utterly unworkable. Such a test might invalidate virtually all antenuptial agreements on the ground that the parties contemplated dissolution, or it might uphold all on the ground that the parties also contemplated the possibility of a lifelong relationship, but it provides no principled basis for determining which antenuptial agreements offend public policy and which do not.

We conclude that an antenuptial agreement violates the state policy favoring marriage only insofar as its terms encourage or promote dissolution. The dictum in *Higgason* that such agreements are invalid unless the parties contemplated a marriage lasting until death is hereby disapproved.

In view of our conclusion that the validity of an antenuptial agreement does not turn on whether the parties contemplated a lifelong marriage, Betty's claim that uncontradicted evidence establishes that both parties contemplated that the marriage relationship would be eventually terminated by separation and dissolution does not frame an issue relevant to the validity of the agreement. The testimony on which Betty relies does not relate to the meaning or interpretation of the agreement, but to the supposed invalidity of the agreement under *Higgason*'s dictum that valid antenuptial agreements must be made in contemplation of a lifelong marriage; in disapproving that dictum, we expose and demonstrate the irrelevancy of the offered testimony.

Under the principles we have explained, Betty can succeed in overturning the trial court's order enforcing the agreement only if she can show that the *terms* of the agreement promote or encourage the dissolution of their marriage. An examination of the Dawleys' antenuptial contract, however, reveals no provision which on its face might promote or encourage dissolution, and Betty presented no evidence to show that any provision is reasonably susceptible of an interpretation which might promote or encourage dissolution. Betty could hardly complain that the property division established in paragraphs V, VI and VII of the agreement as such cannot stand; similar separate property agreements have been upheld in numerous cases. (See *Barker* v. *Barker, supra,* 139 Cal.App.2d 206, 212 and cases there cited.) Betty does argue, however, that the 14-month provision in paragraph VIII offends public policy and that the property division of paragraphs VI and VII fails because it is inseverably linked to the offending language.

Paragraph VIII provides that if James and Betty are married, he will support Carolyn and her "for the minimum period of fourteen calendar months following said marriage" in order that Betty can take a leave of absence from teaching. Betty points out that once she and James were married, he would have a legal duty to support her. (See Civ. Code, § 5100.) Hence, she maintains, the real purpose of paragraph VIII is not to provide for her support, but to limit James' duty of support to the first 14 months following the marriage. Relying on decisions which hold that provisions which waive or limit the right of spousal support violate public policy (see *In re Marriage of Higgason, supra,* 10 Cal.3d 476, 486-487; *Barham* v. *Barham, supra,* 33 Cal.2d 416, 428; *Pereira* v. *Pereira, supra,* 156 Cal. 1, 4-5; *Whiting* v. *Whiting, supra,* 62 Cal.App. 157, 167-168), Betty concludes that paragraph VIII in the Dawleys' contract also violates public policy.

Betty bases her argument interpreting paragraph VIII not upon extrinsic evidence offered to clarify the meaning of that paragraph,[7] but

---

[7]Although Betty presented evidence that she and James contemplated an early dissolution of their marriage, she presented no evidence that they intended by *paragraph VIII* to limit James' duty of spousal support or to promote the dissolution of the marriage. Moreover, in any event we doubt whether extrinsic evidence would be admissible to show that paragraph VIII limited James' support obligation. The paragraph expressly describes the 14-month period as the "minimum" period during which James must support Betty; that language is not reasonably susceptible of any interpretation that would establish 14 months as the "maximum" period of support. Extrinsic evidence offered to prove an interpretation to which a document is not reasonably susceptible is inadmissible. (*Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373].)

on the plain language of the provision and her claim that such language logically can only serve the purpose of limiting James' duty of support. Her argument based upon the wording of paragraph VIII, however, overlooks the fact that the paragraph explicitly states that 14 months is the *"minimum"* period of support. (Italics added.) Such language cannot reasonably be construed to impose a *maximum* limit on James' obligation. Betty also overlooks the fact that paragraph VIII requires James to support Carolyn, Betty's daughter, for the minimum period of 14 months. Carolyn is not James' issue, and he had no legal duty to support her. (See *Spellens* v. *Spellens* (1957) 49 Cal.2d 210, 223 [317 P.2d 613].)

Betty's assertion that paragraph VIII can only serve the purpose of limiting James' duty of support is equally oblivious to the language of the agreement. Paragraph VIII specifies its purpose: to permit Betty to take a leave of absence from teaching. Before she could risk foregoing her teaching income, Betty needed some assurance that she and Carolyn would be supported by James; paragraph VIII served to give that assurance. Without the protection of this paragraph, Betty could assert no right to receive support for Carolyn; moreover, James might at any time file for dissolution and attempt to terminate his duty to support Betty. Paragraph VIII, however, served to guarantee Betty that even if James filed for dissolution during her leave of absence, he would still be required to pay for her support and Carolyn's support. Thus the purpose of paragraph VIII was not to promote dissolution, but to deter dissolution.

We conclude that neither paragraph VIII nor any other provision of the Dawleys' agreement violates the public policy against provisions which promote or encourage the dissolution of marriage. Finding the agreement valid and binding upon the parties, we uphold the trial court's division of property based upon its terms.

3. ▇ *The antenuptial agreement was not procured by undue influence.*

Betty contends that the antenuptial agreement is tainted by undue influence. The issue of whether or not undue influence has been exerted frames a question of fact (see *Estate of Larendon* (1963) 216 Cal.App.2d 14, 19 [30 Cal.Rptr. 697]; *Weger* v. *Rocha* (1934) 138 Cal.App. 109, 113 [32 P.2d 417]); the trial court in the instant case, however, rendered no finding on that issue. Since Betty did not invoke her right to request a special finding (see Code Civ. Proc., § 634), we may resort to an implied finding to uphold the judgment. (See 4 Witkin, Cal. Procedure (2d ed.)

p. 3143.) From the trial court's conclusion that Betty freely and voluntarily entered into the antenuptial agreement we therefore imply a finding that her consent was not procured by undue influence.

Substantial evidence supports the implied finding negating undue influence. Parties who are not yet married are not presumed to share a confidential relationship (*Handley* v. *Handley* (1952) 113 Cal.App.2d 280, 285 [248 P.2d 59]; see *Thorpe* v. *Thorpe* (1946) 75 Cal.App.2d 605, 611 [171 P.2d 126]); the record demonstrates that Betty did not rely on the advice and integrity of James in entering into the antenuptial agreement.

Betty points out that even in the absence of a confidential relationship, a contract may be tainted by undue influence if one party takes "a grossly oppressive and unfair advantage of another's necessities or distress." (Civ. Code, § 1575.) We appreciate that Betty was compelled to enter into the antenuptial agreement by her unplanned pregnancy and her fear that she would lose her job, but James, threatened with a paternity suit and likely loss of his position, was in no position to take advantage of her distress. Perhaps reflecting this rough equality of bargaining power, the Dawleys' antenuptial agreement was in no way "oppressive or unfair." Both James and Betty secured their earnings and property acquired with those earnings as separate property, and James agreed to support both Betty and her daughter during the period when Betty would not be working.[8]

We therefore conclude that substantial evidence supports the trial court's finding that the agreement was not procured by undue influence.

4. ██ *The parties did not rescind the antenuptial agreement.*

---

[8]*Estate of Nelson, supra,* 224 Cal.App.2d 138, on which Betty bases her contention, is factually distinguishable. In *Nelson* a 50-year-old real estate broker, before marrying his 22-year-old secretary, obtained from her an agreement in which she waived all community property rights, and agreed that in event of divorce Nelson would neither pay spousal support nor be responsible for more than $150 in attorney's fees and costs. Stating that the consideration to the wife was so small as to shock the conscience of the court, the Court of Appeal upheld the trial court's determination that the agreement was procured by fraud and undue influence.

In contrast to *Nelson,* in the case at bar both husband and wife were educated and experienced professionals. Betty did not rely on James' advice, but consulted her personal counsel before executing the agreement. Finally, the terms of the Dawleys' antenuptial agreement do not shock the conscience, but provide significant benefits for both parties.

Betty contends that after the 14-month leave of absence ended, she and James by their conduct impliedly rescinded the property provisions of the antenuptial agreement. The trial court, however, found that "The parties freely continued to live together as husband and wife until July 1972, with each party retaining exclusive control over his or her earnings and property, and freely electing to spend or disburse the same in a manner of his or her own choosing. During their eight-year marriage, the parties never had a joint bank account and never purchased a single item of personal or real property in both their names, [9] but maintained everything as separate property, including their income taxes, which they endeavored to adjust to coincide with their relative contributions to their separate property." On the basis of this finding the court concluded that the parties relied upon the antenuptial agreement during the entire course of their marriage.

Betty does not take issue with the specific findings of the trial court, but contends that as a matter of law the evidence which she presented compels the conclusion that the agreement was rescinded. In support of this contention she points to testimony that James referred to their residence as "our house," that in discussing payment of bills he said that "the money all goes into the same pot," and that she and James filed joint income tax returns. The trial court, however, could reasonably consider the quoted statements of James of less significance than the parties' consistent policy of holding earnings in separate accounts and purchasing property in only the name of the acquiring spouse.

The Dawleys' filing of joint income tax returns does not compel the conclusion that their earnings were community property (see *Barker* v. *Barker, supra,* 139 Cal.App.2d 206, 212-213); the fact that they went to the trouble to allocate tax liability in accord with the improvements made to separate property strongly indicates that they did not regard their earnings as a community asset. We therefore conclude that substantial evidence sustains the finding of the trial court, and that this finding supports the court's conclusion that the parties continue to observe their agreement for the duration of the marriage.

5. ■ *The Ranger sloop is James' separate property.*

---

[9] The trial court's finding that the parties never purchased personal property in both their names is not entirely accurate. As will be seen in part 5 of this opinion, the Dawleys did purchase a boat and take title in both names.

During the marriage James arranged to purchase a 33-foot sloop for $25,000. He paid the $13,000 down payment with his separate property, and borrowed from the Lockheed Credit Union to finance the balance of the price. At the insistence of the credit union, both James and Betty signed for the loan, and title to the boat was issued in both names. James paid all loan payments and expenses of the boat from his separate funds.

The trial court concluded that the boat was James' separate property.[10] Betty objects to this conclusion. and asserts a community property interest in the boat.

In the absence of the antenuptial agreement Betty's claim, based upon the presumption that property acquired on credit during marriage is community property (*Kenney* v. *Kenney* (1954) 128 Cal.App.2d 128, 142 [274 P.2d 951]; *Hogevoll* v. *Hogevoll* (1943) 59 Cal.App.2d 188, 193-194 [138 P.2d 693]), might have merit. Civil Code section 5133, however, specifies that the presumptions of the Family Law Act do not govern the status of marital property when "there is a marriage settlement containing stipulations contrary thereto." (See *Cheney* v. *City & County of San Francisco* (1936) 7 Cal.2d 565, 569 [61 P.2d 754]; *Kenney* v. *Kenney*, *supra*, 128 Cal.App.2d 128, 135.) Thus in the Dawley marriage the community or separate character of property is not fixed by the presumptions set forth in the Civil Code or by the judicial opinions interpreting those presumptions, but by the terms of the antenuptial contract.[11]

The antenuptial agreement on its face appears a comprehensive attempt to provide that all property owned by the Dawleys at the time of marriage, or acquired thereafter, would be either James' or Bettys' separate property. As we read the contract, the parties intended there to be no community property. The conduct of the parties pursuant to this agreement, as summarized in the trial court's finding quoted in part four of this opinion, supports that interpretation.

---

[10]After filing the dissolution action James renegotiated the loan as his separate obligation. Thus Betty is not subject to potential liability as a co-signer of the obligation.

[11]We are not here concerned with a case in which a creditor claims to have been misled to its detriment by the failure of the spouses to inform it that by virtue of an agreement between them the supposed community assets on which the creditor relies are in fact separate assets. (See generally Shapiro, *Antenuptial Agreements and California Law* (Sept./Oct. 1975) Bev. Hills L.J. 76, 82.)

Although the agreement does not expressly refer to property purchased on credit, it provides that property acquired by James "by purchase . . . during the marriage" shall be his separate property. As we have observed, James paid the down payment on the boat from his separate assets, and paid each installment on the loan as it fell due from separate property. Under these circumstances we interpret the agreement, as did the trial court, to render the sloop James' separate property.

## 6. Conclusion.

In times past antenuptial agreements were most often used by wealthy men and women who feared that less wealthy fiancés might be marrying for money. In recent years, however, an increasing number of couples have executed antenuptial agreements in order to structure their legal relationship in a manner more suited to their needs and values. (See generally Weitzman, *Legal Regulation of Marriage: Tradition and Change* (1974) 62 Cal.L.Rev. 1169.) Neither the reordering of property rights to fit the needs and desires of the couple, nor realistic planning that takes account of the possibility of dissolution, offends the public policy favoring and protecting marriage. It is only when the terms of an agreement go further—when they promote and encourage dissolution, and thereby threaten to induce the destruction of a marriage that might otherwise endure—that such terms offend public policy.

For the reasons we have explained, the agreement at bar does not fall within this ban. Having freely contracted that the earnings of each, and property derived from those earnings, will be the separate property of the earning spouse, the parties are bound by their agreement.

The judgment is affirmed.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.