[No. A133952. First Dist., Div. Two. Dec. 13, 2012.]

Estate of PHILIP TIMOTHY WILSON, Deceased.
ANTIPAS JOHNLANG KONOU, Petitioner and Appellant, v.
STEPHEN M. WILSON et al., Objectors and Respondents.

COUNSEL

Pamela E. Smith for Petitioner and Appellant.

Cooper, White & Cooper, L. Randolph Harris and Richard J. Collier for Objectors and Respondents.

OPINION

**LAMBDEN, J.**—In 2006, Dr. Philip Timothy Wilson and Antipas Johnlang Konou executed a "Pre Registration Domestic Partnership Agreement" (the domestic partnership agreement or the agreement) and then registered as domestic partners. The agreement included waivers of any rights, claims or interest in the future property, income, or estate of the other, and required a signed writing to amend or terminate this agreement. A couple of years later, in 2008, Wilson and Konou married during the brief period that same-sex marriages were legal in California. Shortly thereafter, Wilson died.

Konou filed a petition claiming an omitted spouse's interest in Wilson's estate. The probate court rejected Konou's claim and found that Konou was an omitted spouse but that the domestic partnership agreement remained valid after the marriage and Konou waived his rights to any interest in Wilson's estate in this agreement.

Konou appeals and argues that the probate court erred because a marriage is not the same as a domestic partnership and there was no prenuptial agreement. He claims that the marriage license constituted a signed writing that terminated the domestic partnership agreement.

We hold that domestic partnership agreements that are enforceable under the Uniform Premarital Agreement Act (Fam. Code, §§ 1600–1617),[1] and made after statutes were enacted providing domestic partners with essentially the same California state property rights as spouses, are not automatically invalidated by a marriage license. Since Konou expressly waived his rights to any interest in Wilson's estate in the domestic partnership agreement and the validity of this agreement under the Uniform Premarital Agreement Act is not an issue, he cannot claim any interest as a pretermitted spouse in Wilson's estate. Accordingly, we affirm the trial court's order.

## BACKGROUND

In 1986, Wilson executed his will. In his will, he specified that certain property was to go to Douglas Glen Vanderburg, his partner at that time. Vanderburg was to receive one-half of the residue and the remaining one-half was to be divided equally among Wilson's three brothers and one sister. Vanderburg and Wilson had registered as domestic partners with the City and County of San Francisco and they terminated that relationship on October 7, 1993.

In 2005, Wilson and Konou became involved in "a committed, personal relationship." In 2006, they decided to register as domestic partners and, prior to registering, they entered into an agreement. On May 9, 2006, Wilson and Konou, and their separate counsel, signed a domestic partnership agreement that set forth the property rights and obligations of Wilson and Konou. The parties acknowledged in the agreement that their separate legal counsel had advised them about their property rights under the law. Wilson, according to the agreement, was employed by the State of California as a chief psychiatrist and Konou was employed by an antique books dealer. The agreement noted that Konou had been incarcerated for six years, and was released in February 2005; thus, he had no recent tax returns.

The stated "purpose" of the agreement was "to define [the parties'] respective property rights and support rights, both prior to and during the course of their domestic partnership as well as in the event of termination of the domestic partnership by either death, dissolution or legal separation." The agreement included disclosures of the parties' property and financial obligations.

---

[1] All further unspecified code sections refer to the Family Code.

Under "Waiver of Property Rights," at paragraph 6, the agreement read: "Parties expressly waive any rights, claims or interest whatsoever in law or equity in the present or future property, income, or estate of the other, or to a right to receive support or any other payments of any kind from the other arising by any reason of their relationship prior to registration as domestic partners."

At paragraph 8, the agreement set forth the following: "To the extent that parties both desire a result different from the terms of the agreement herein, parties understand that a new and separate written agreement must be executed by both parties, preferably on the advice of separate legal counsel."

The parties acknowledged that they understood that the law applicable to their relationship could be modified in the future. Paragraph 10 specified as follows: "Parties acknowledge that they have been advised to discuss the applicable law with their attorneys in order to better understand the concepts of community and separate property. Parties acknowledge that some challenges [to the existing statutes] are expected and that it is impossible to understand exactly how the new statutes will be impacting registered domestic partners. Notwithstanding, parties hereby acknowledge the desire to enter into this agreement with the desire to have the terms set forth in this agreement apply to any termination of their relationship by dissolution, death or legal separation and to control their ownership of property during the relationship and to define their rights and obligations to each other in the event of termination of the relationship by dissolution, death or legal separation."

Under paragraph 14, the agreement declared the following: "No Restrictions on Transfers at Death. Each of the parties hereby waives the right to receive any property or rights upon the death of the other party unless that right is created or affirmed by the other party in a living trust, last will and testament or other written document. Each party's waiver is intended to be an enforceable waiver of that party's rights under Probate Code sections 140–147." Paragraph 18 specified that this was the entire agreement and stated as follows: "This agreement contains the entire agreement of the parties on these matters, superseding any previous agreement between them. This agreement may not be amended or terminated except in a written instrument signed by both parties."

At paragraph 31, the domestic partnership agreement provided that "[a]ny subsequent changes in California or federal law that create or give rise to additional or altered rights and obligations of the parties shall not affect this Agreement."

On May 17, 2006, Wilson and Konou registered their domestic partnership.

During the period that same-sex couples could legally marry in California, Wilson and Konou decided to marry. They married on June 30, 2008, and were issued their license and certificate of marriage on July 29, 2008. Less than five months after their marriage, on November 6, 2008, Wilson committed suicide.

In February 2009, Wilson's brother, Stephen Wilson (Stephen), filed a petition for probate of Wilson's will, and was issued letters as administrator with will annexed on March 23, 2009. On January 13, 2009, Vanderburg disclaimed any right, claim, title or interest in Wilson's estate. On May 20, 2009, Konou signed a disclaimer of any interest and disclaimed any interest in Wilson's retirement accounts, Wilson's real property, and Wilson's estate.

On April 6, 2011, Konou filed a "petition for determination of entitlement to estate distribution . . . and for invalidation of disclaimer . . . ." Wilson's four siblings (collectively, the siblings), filed an objection to Konou's petition. They filed statements of interests in the estate pursuant to Probate Code section 11702.

The parties stipulated to bifurcate the hearing on Konou's petition and to have the court try the following two issues that they agreed were questions of law: "1. Did the marriage between Dr. Wilson and Mr. Konou invalidate their . . . [d]omestic [p]artnership [a]greement[?]" "2. Is the . . . [d]omestic [p]artnership [a]greement a valid waiver of Mr. Konou's rights as a pretermitted spouse?"

After a hearing, the probate court filed its order on September 23, 2011. The court found that the marriage of Wilson and Konou did not invalidate their domestic partnership agreement, and that the agreement was a valid waiver of Konou's rights as a pretermitted spouse.

Konou filed a timely notice of appeal. The siblings filed a motion to dismiss the appeal, and we denied that motion on April 26, 2012. On September 18, 2012, the siblings filed an unopposed request for judicial notice of documents regarding the legislative history of section 299. We granted that request on October 5, 2012. On October 23, 2012, the siblings filed a motion to augment the record on appeal with the reporter's transcript of the hearing on August 31, 2011, and stated that the transcript was inadvertently omitted from the record. The reporter's transcript was included in the record and thus we denied the siblings' motion as moot.

## DISCUSSION

### I. *Standard of Review*

For the purposes of this appeal, the parties did not dispute the critical facts. In the lower court, they agreed that Wilson and Konou signed the domestic partnership agreement on May 9, 2006; that they registered as domestic partners on May 17, 2006; that they married on June 30, 2008; and that Wilson died on November 6, 2008.

The probate court interpreted the domestic partnership agreement and applied the law based on undisputed facts. The applicability of a statutory standard to undisputed facts and questions of statutory interpretation are questions of law that are reviewed de novo. (*International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611 [38 Cal.Rptr.2d 150, 888 P.2d 1279].) Similarly, we apply a de novo standard of review when the meaning of a contract may be determined without the aid of extrinsic evidence. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].)

### II. *A Summary of the Current California Law on Domestic Partnerships and Marriages for Same-sex Couples*

The history of California's domestic partnership and marriage statutes for same-sex partners is detailed in *In re Marriage Cases* (2008) 43 Cal.4th 757 [76 Cal.Rptr.3d 683, 183 P.3d 384] (*Marriage Cases*). (See *In re Domestic Partnership of Ellis and Arriaga* (2008) 162 Cal.App.4th 1000 [76 Cal.Rptr.3d 401].) Thus, here, we provide only a brief summary of the development of the law.

In 1999, the California Legislature enacted the state's domestic partnership statutes. (Stats. 1999, ch. 588, § 2, p. 4157 [adding §§ 297–299.6].) The legislation allowed same-sex couples over the age of 18 to become domestic partners. (Former § 297, subd. (b)(6)(A) & (B), added by Stats. 1999, ch. 588, § 2, p. 4157.) This legislation afforded domestic partners limited substantive benefits. (See *Marriage Cases, supra*, 43 Cal.4th at p. 801.) In 2000, California adopted Proposition 22, an initiative statute, which provided, "Only marriage between a man and a woman is valid or recognized in California." (Fam. Code, § 308.5.) The Legislature expanded the scope of benefits provided to domestic partners in 2001 and, again, in 2002. (*Marriage Cases*, at pp. 801–802.)

In 2003, the Legislature expanded the rights of domestic partners by enacting the California Domestic Partner Rights and Responsibilities Act of

2003 (Domestic Partner Act). (See *Marriage Cases, supra,* 43 Cal.4th at p. 802.) "As compared to the former system of granting specific, limited rights, the Domestic Partner Act 'extends to registered domestic partners substantially all rights, benefits, and obligations of married persons under state law, with the exception of rights, benefits, and obligations accorded only to married persons by federal law, the California Constitution, or initiative statutes.' (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 205 (2003–2004 Reg. Sess.) as amended Aug. 21, 2003, p. 2 . . . .)" (*In re Domestic Partnership of Ellis and Arriaga, supra,* 162 Cal.App.4th at pp. 1006–1007; see *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 839 [31 Cal.Rptr.3d 565, 115 P.3d 1212].) The Domestic Partner Act "must be construed liberally to give registered domestic partners the same rights and obligations as married couples, to the extent permissible by law . . . ." (*In re Domestic Partnership of Ellis and Arriaga,* at p. 1008.)

In 2006, the Legislature amended section 297.5 to eliminate a disparity in the treatment of registered domestic partners and married couples with regard to state income taxes.[2] (See *Marriage Cases, supra,* 43 Cal.4th at p. 804.) In

---

[2] Our Supreme Court set forth the various differences between domestic partnership and marriage statutes as follows: "First, although the domestic partnership provisions require that both partners have a common residence at the time a domestic partnership is established [citation], there is no similar requirement for marriage. Second, although the domestic partnership legislation requires that both persons be at least 18 years of age when the partnership is established [citation], the marriage statutes permit a person under the age of 18 to marry with the consent of a parent or guardian or a court order [citations]. Third, to establish a domestic partnership, the two persons desiring to become domestic partners must complete and file a Declaration of Domestic Partnership with the Secretary of State, who registers the declaration in a statewide registry for such partnerships [citation]; to marry, a couple must obtain a marriage license and certificate of registry of marriage from the county clerk, have the marriage solemnized by an authorized individual, and return the marriage license and certificate of registry to the county recorder of the county in which the license was issued, who keeps a copy of the certificate of registry of marriage and transmits the original certificate to the State Registrar of Vital Statistics [citations]. Fourth, although the marriage statutes establish a procedure under which an unmarried man and unmarried woman who have been residing together as husband and wife may enter into a 'confidential marriage' in which the marriage certificate and date of the marriage are not made available to the public [citation], the domestic partnership law contains no similar provisions for 'confidential domestic partnership.' Fifth, although both the domestic partnership and marriage statutes provide a procedure for summary dissolution of the domestic partnership or marriage under the same limited circumstances, a summary dissolution of a domestic partnership is initiated by the partners' joint filing of a Notice of Termination of Domestic Partnership with the Secretary of State and may become effective without any court action, whereas a summary dissolution of a marriage is initiated by the spouses' joint filing of a petition in superior court and becomes effective only upon entry of a court judgment; in both instances, the dissolution does not take effect for at least six months from the date dissolution is sought, and during that period either party may terminate the summary dissolution. [Citations.] Sixth, although a proceeding to dissolve a domestic partnership may be filed in superior court 'even if neither domestic partner is a

2007, a law was passed affording domestic partners the opportunity to effectuate a change of name during the domestic partner registration process. (*Ibid.*)

The Domestic Partner Act, in amending section 297, sets forth the requirements for establishing a domestic partnership.[3] Section 297.5, subdivision (a) provides: "(a) Registered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same responsibilities, obligations, and duties under law, whether they derive from statutes, administrative regulations, court rules, government policies, common law, or any other provisions or sources of law, as are granted to and imposed upon spouses." Section 299 sets forth the manner in which a domestic partnership can be terminated.

In 2008, our Supreme Court considered the claims by same-sex couples that the marriage statutes violated the California Constitution. The court held in *Marriage Cases, supra,* 43 Cal.4th 757 that the fundamental right to marry

---

resident of, or maintains a domicile in, the state at the time the proceedings are filed' [citation], a judgment of dissolution of marriage may not be obtained unless one of the parties has been a resident of California for six months and a resident of the county in which the proceeding is filed for three months prior to the filing of the petition for dissolution [citation]. Seventh, in order to protect the federal tax-qualified status of the CalPERS (California Public Employees' Retirement System) long-term care insurance program . . . , the domestic partnership statute provides that 'nothing in this section applies to modify eligibility for [such] long-term care plans' [citation], which means that although such a plan may provide coverage for a state employee's spouse, it may not provide coverage for an employee's domestic partner; this same disparity, however, would exist even if same-sex couples were permitted to marry under California law, because for federal law purposes the nonemployee partner would not be considered a spouse. [Citation.] Eighth, an additional difference stems from the provisions of California Constitution, article XIII, section 3, subdivisions (*o*) and (p), granting a $1,000 property tax exemption to an 'unmarried spouse of a deceased veteran' who owns property valued at less than $10,000 . . . . Ninth, one appellate decision has held that the putative spouse doctrine (codified in § 2251) does not apply to an asserted putative domestic partner. (*Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1172–1174 [48 Cal.Rptr.3d 642] . . . .)" (*Marriage Cases, supra,* 43 Cal.4th at p. 805, fn. 24.)

[3] Section 297 provides: "(a) Domestic partners are two adults who have chosen to share one another's lives in an intimate and committed relationship of mutual caring. [¶] (b) A domestic partnership shall be established in California when both persons file a Declaration of Domestic Partnership with the Secretary of State pursuant to this division, and, at the time of filing, all of the following requirements are met: [¶] (1) Neither person is married to someone else or is a member of another domestic partnership with someone else that has not been terminated, dissolved, or adjudged a nullity. [¶] (2) The two persons are not related by blood in a way that would prevent them from being married to each other in this state. [¶] (3) Both persons are at least 18 years of age . . . . [¶] (4) Either of the following: [¶] (A) Both persons are members of the same sex. [¶] (B) One or both of the persons meet the eligibility criteria under Title II of the Social Security Act . . . . Notwithstanding any other provision of this section, persons of opposite sexes may not constitute a domestic partnership unless one or both of the persons are over 62 years of age. [¶] (5) Both persons are capable of consenting to the domestic partnership."

provided by the California Constitution could not be denied to same-sex couples, who are guaranteed "the same substantive constitutional rights as opposite-sex couples to choose one's life partner and enter with that person into a committed, officially recognized, and protected family relationship that enjoys all of the constitutionally based incidents of marriage." (*Marriage Cases*, at p. 829, fn. omitted.) The court also held that assigning a different name for the official family relationship for opposite-sex couples and same-sex couples violated the equal protection clause in article I, section 7 of the California Constitution. (*Marriage Cases*, at pp. 855–856.) The court struck the language from the marriage statutes that limited the designation of a marriage to a union between a man and a woman, invalidated Proposition 22, and ordered that the designation of marriage be made available to both opposite-sex and same-sex couples. (*Marriage Cases*, at pp. 855–856.) *Marriage Cases* did not invalidate the existing California statutes pertaining to domestic partnership and domestic partner registration.

From June 17, 2008, until the election in November 2008, ". . . California counties issued more than 18,000 marriage licenses to same-sex couples." (*Perry v. Brown* (9th Cir. 2012) 671 F.3d 1052, 1067, cert. granted Dec. 7, 2012, *Hollingsworth v. Perry* (2012) 558 U.S. ___ [184 L.Ed.2d 526, 133 S.Ct 786].) In November 2008, voters approved Proposition 8, which amended the California Constitution and declared: " 'Only marriage between a man and a woman is valid or recognized in California.' " (*Perry v. Schwarzenegger* (N.D.Cal. 2010) 704 F.Supp.2d 921, 927.)

Opponents of Proposition 8 challenged the initiative through an original writ of mandate in our Supreme Court as, among other things, violating the rules for amending the California Constitution. (*Strauss v. Horton* (2009) 46 Cal.4th 364 [93 Cal.Rptr.3d 591, 207 P.3d 48].) Our Supreme Court upheld Proposition 8 but held that the 18,000 marriages of same-sex couples performed before Proposition 8 and after the decision in *Marriage Cases* remained valid. (*Strauss v. Horton*, at pp. 473–474.)

Two same-sex couples challenged Proposition 8 in the federal court as depriving same-sex couples of due process and equal protection of the laws in violation of the Fourteenth Amendment. (*Perry v. Schwarzenegger, supra*, 704 F.Supp.2d 921.) The federal district court held a trial and found that the California constitutional amendment defining marriage as one between a man and woman violated the due process and equal protection clauses of the Fourteenth Amendment. (*Perry v. Schwarzenegger*, at pp. 995, 1003.) The court found that the evidence did not support a finding "that California has an interest in preferring opposite-sex parents over same-sex parents. Indeed, the evidence shows beyond any doubt that parents' genders are irrelevant to children's developmental outcomes." (*Id.* at p. 1000.)

*Perry v. Schwarzenegger, supra,* 704 F.Supp.2d 921 was affirmed on narrower grounds by the Ninth Circuit in *Perry v. Brown, supra,* 671 F.3d 1052. The court did not address the constitutionality of a ban of same-sex marriage, but instead examined "whether the people of a state may by plebiscite strip a group of a right or benefit, constitutional or otherwise, that they had previously enjoyed on terms of equality with all others in the state." (*Perry v. Brown,* at p. 1082, fn. 14.) The Ninth Circuit held that Proposition 8, which had the effect of eliminating the right of same-sex couples to marry in California, had no rational effect on the procreation and child rearing practices of opposite-sex married (or unmarried) couples. (*Perry v. Brown,* at pp. 1086–1095.) The court concluded that Proposition 8 was unconstitutional on equal protection grounds as the law amending the state Constitution to eliminate the right of same-sex couples to marry "serves no purpose, and has no effect, other than to lessen the status and human dignity of gays and lesbians in California, and to officially reclassify their relationships and families as inferior to those of opposite-sex couples." (*Perry v. Brown,* at p. 1063.)[4]

In 2010, section 299 was amended to add subdivision (e), which states: "Parties to a registered domestic partnership who are also married to one another may petition the court to dissolve both their domestic partnership and their marriage in a single proceeding, in a form that shall be prescribed by the Judicial Council." Prior to this amendment, same-sex couples who were registered domestic partners and married and wishing to terminate their relationship had to dissolve both their marriage and domestic partnership in two separate proceedings. With the addition of subdivision (e) to section 299, both relationships could be terminated in one procedure.

### III. *Konou's Claim to Rights as an Omitted Spouse*

#### A. *Introduction*

In the present case, Wilson executed his will before he ever met Konou and the will did not mention Konou. Thus, the parties stipulated that Konou was a pretermitted spouse under Probate Code section 21610.

█ Konou and Wilson signed a domestic partnership agreement in 2006. At that time, the Domestic Partner Act had been enacted, and the property rights for domestic partners were essentially the same as those for married couples. (§ 297.5, subd. (a) ["[r]egistered domestic partners shall have the same rights, protections, and benefits, and shall be subject to the same

---

[4] The petition for a writ of certiorari was granted by the United States Supreme Court in this case on December 7, 2012. (*Hollingsworth v. Perry, supra,* 558 U.S. ___ [184 L.Ed.2d 526].)

responsibilities, obligations, and duties under law . . . as are granted to and imposed upon spouses"]; see *Marriage Cases, supra,* 43 Cal.4th at p. 804.) Since a domestic partner has the same "rights" and "protections" as a married spouse (§ 297.5, subd. (a)), section 1615, part of the Uniform Prenuptial Agreement Act (§§ 1600–1617), which provides the requirements for an enforceable prenuptial agreement and the grounds for making the contract unenforceable, applies to the domestic partnership agreement.[5] Here, Konou did not challenge the validity of the agreement in the probate court.[6]

---

[5] Section 1615 provides: "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following:

"(1) That party did not execute the agreement voluntarily.

"(2) The agreement was unconscionable when it was executed and, before execution of the agreement, all of the following applied to that party:

"(A) That party was not provided a fair, reasonable, and full disclosure of the property or financial obligations of the other party.

"(B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided.

"(C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

"(b) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law.

"(c) For the purposes of subdivision (a), it shall be deemed that a premarital agreement was not executed voluntarily unless the court finds in writing or on the record all of the following:

"(1) The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel.

"(2) The party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed.

"(3) The party against whom enforcement is sought, if unrepresented by legal counsel, was fully informed of the terms and basic effect of the agreement as well as the rights and obligations he or she was giving up by signing the agreement, and was proficient in the language in which the explanation of the party's rights was conducted and in which the agreement was written. The explanation of the rights and obligations relinquished shall be memorialized in writing and delivered to the party prior to signing the agreement. The unrepresented party shall, on or before the signing of the premarital agreement, execute a document declaring that he or she received the information required by this paragraph and indicating who provided that information.

"(4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement.

"(5) Any other factors the court deems relevant."

[6] In his reply brief, Konou asserts that the deeds, appraisals, and other references to exhibits in the agreement are not in the record on appeal and thus the record does not establish that all property disclosures were made as required by section 1615. The domestic partnership agreement refers to exhibits that are not included in this record but Konou never alleged in the probate court that he had not received or reviewed a copy of these exhibits at the time he signed the agreement. He never alleged that any property was not properly disclosed to him. Accordingly, he has waived any challenge to the agreement based on a failure to disclose all assets as required under section 1615.

Under the express terms of their domestic partnership agreement, Konou and Wilson waived "the right to receive any property or rights upon the death of the other party unless that right is created or affirmed by the other party in a living trust, last will and testament or other written document." Various provisions in the domestic partnership agreement stated that the agreement could not be amended or terminated except in a written instrument signed by both parties.

Konou does not dispute that the domestic partnership agreement could be modified or terminated only by a writing. He asserts that the marriage license constituted a contract providing him with particular rights different from those of a domestic partnership, and that this marriage license, signed by both parties, terminated the property arrangement set forth in the domestic partnership agreement. As we discuss below, we disagree that the marriage license invalidated the domestic partnership agreement.

## B. *The Effect of the Marriage License*

When Wilson and Konou married in 2008, their domestic partnership remained in effect.[7] They never dissolved their domestic partnership pursuant to section 299. Wilson and Konou did not sign a new agreement regarding their property disposition when they married.

 The law is well settled that a marriage license does not invalidate a prenuptial agreement. Parties contemplating marriage may validly contract as to their property rights, both as to property then owned and as to property and earnings that may be acquired during the marriage. (*In re Marriage of Dawley* (1976) 17 Cal.3d 342, 349 [131 Cal.Rptr. 3, 551 P.2d 323].) Similarly, a domestic partnership agreement remains valid after the parties register as domestic partners. The fact that one agreement is named a domestic partnership agreement and another is named a prenuptial agreement is insignificant as the purpose of both is to permit the parties to enter into a contract that reflects their wishes regarding the property they own and will acquire in the future. A marriage by a same-sex couple in 2008 after the couple had previously registered their domestic partnership did not provide the couple with any additional state property rights or obligations.

A marriage license and certificate of marriage, like a declaration of domestic partnership, is a written instrument signed by the parties, but it does

---

[7] The Legislature should consider addressing the fact that a number of same-sex couples marrying in 2008 before the passage of Proposition 8 find themselves in a unique situation as they are both married couples and domestic partners. Not only does this differentiate them from opposite-sex couples, but also it places them in an untenable position when completing forms that often require a selection of one status and do not permit the selection of both marriage and domestic partner. Furthermore, being compelled to select both statuses confers on them a status that differentiates them from opposite-sex couples.

not modify or terminate any existing agreement regarding the division of property. The domestic partnership agreement serves the same function as a premarital agreement and, unless the express terms of the agreement provide otherwise, it remains in effect during a marriage.

The trial court's finding that "the marriage license is devoid of any language which can be interpreted to be an amendment or a termination of the" domestic partnership agreement, is, according to Konou, "akin to saying that an Articles of Incorporation is just a piece of paper signed by one person." He maintains that the marriage license is a written document (see § 300),[8] signed by both parties, which terminates the domestic partnership agreement. He argues that Konou and Wilson entered into a marriage without a premarital agreement and thus the legal terms and conditions of a marriage apply to each spouse.

■ Konou's argument ignores that marriage licenses are silent regarding property rights. The status of marriage, as well as the status of a domestic partnership, entitles people to statutory rights but they are free to contract and change these rights. Here, the domestic partnership agreement set forth the parties' intent regarding their property and no writing expressly terminated or amended this enforceable agreement. As already noted, the agreement functioned similarly to a prenuptial agreement and no language in this agreement indicated that it would be amended or terminated by a change in the law allowing marriage or by the parties' marrying.

The domestic partnership agreement did not specify that it would become null if the law changed to permit same-sex marriage. To the contrary, at paragraph 31, the agreement provided that "[a]ny subsequent changes in California or federal law that create or give rise to additional or altered rights and obligations of the parties shall not affect this Agreement." The agreement also stated: "Parties acknowledge that some challenges [to the existing statutes] are expected and that it is impossible to understand exactly how the new statutes will be impacting registered domestic partners. Notwithstanding, parties hereby acknowledge the desire to enter into this agreement with the desire to have the terms set forth in this agreement apply to any termination of their relationship by dissolution, death or legal separation and to control their ownership of property during the relationship and to define their rights and obligations to each other in the event of termination of the relationship by dissolution, death or legal separation."

---

[8] Section 300 reads: "(a) Marriage is a personal relation arising out of a civil contract between a man and a woman, to which the consent of the parties capable of making that contract is necessary. Consent alone does not constitute marriage. Consent must be followed by the issuance of a license and solemnization as authorized by this division . . . . [¶] (b) For purposes of this part, the document issued by the county clerk is a marriage license until it is registered with the county recorder, at which time the license becomes a marriage certificate."

The foregoing terms make it clear that the parties wanted the agreement to endure throughout their relationship and until their relationship was terminated by dissolution, death, or legal separation. Wilson and Konou's relationship was terminated by Wilson's death, and the terms of this agreement thus apply to their rights and obligations to each other.

Konou argues that the references to a change in the law related to domestic partnership law, not the creation of new marriage rights. He emphasizes that the word "marriage" did not appear in the agreement.

The fact that the word "marriage" does not appear in the agreement does not indicate that the parties intended their agreement to terminate if the law changed to permit them to get legally married. In 2006, when they entered into the agreement, they had separate legal counsel and their attorneys advised them about their property rights under the law. Thus, we can presume their counsel explained to them that their property rights under the Domestic Partner Act were essentially the same as the state property rights they would have enjoyed were they legally married. Furthermore, we can presume that the parties were well aware that both the marriage laws and domestic partner laws for same-sex couples might change in the future as the City and County of San Francisco—the place where Konou and Wilson were residing—was issuing marriage licenses to same-sex couples in February 2004, and the legality of these marriages was being litigated at the time of the agreement signed by Wilson and Konou. (See *Marriage Cases, supra*, 43 Cal.4th at p. 785.) The agreement did not specify that the agreement would become null if the law changed to permit their marriage.[9]

Konou quotes extensively from *Marriage Cases, supra*, 43 Cal.4th 757, *Strauss v. Horton, supra*, 46 Cal.4th 364, and *Perry v. Brown, supra*, 671 F.3d 1052, to stress that marriages are different from domestic partnerships. He claims that courts have made it clear that marriage is more than a domestic partnership and thus he argues that something more than a preregistration domestic partnership agreement is needed to alter the marriage contract.

We agree that marriages and domestic partnerships are not equivalent. "Marriage is a civil contract which not only creates reciprocal rights and

---

[9] Konou argues that they could have entered into a premarital or postmarital agreement to modify the rights and responsibilities of their marriage, and their failure to do this evinced an intent to have the rights and responsibilities of marriage. Another explanation for their failure to enter into a premarital or postmarital agreement, however, is that they already had an agreement regarding their property rights and believed that this agreement remained in effect since they had not signed any other agreement regarding their property rights. Nothing in this record indicates Wilson intended to confer on Konou rights different from those specified in the agreement.

obligations as between the contracting parties but which also affects their statuses." (*Estate of Axcelrod* (1944) 23 Cal.2d 761, 767 [147 P.2d 1].) Domestic partnerships do not have the same status, symbolic meaning, or social meaning as marriages. Furthermore, as Konou stresses, the procedures for entering into these relationships are not identical.

▪ The *significant* differences between marriages and domestic partnerships do not blur their similarities. The state property rights and obligations of spouses and domestic partners do not differ significantly. (See *Marriage Cases, supra*, 43 Cal.4th at p. 801; *Strauss v. Horton, supra*, 46 Cal.4th at p. 411; *Perry v. Brown, supra*, 671 F.3d at p. 1063.) Thus, a preregistration domestic partnership agreement that was executed after the enactment of the Domestic Partner Act and enforceable under the Uniform Prenuptial Agreement Act is not automatically invalidated by a marriage license.[10]

## C. *Waiver of Rights as a Pretermitted Spouse*

Konou did not mount any argument on appeal to the trial court's finding that the language of the domestic partnership agreement constituted a valid waiver of his rights as a pretermitted spouse. Thus, he has waived on appeal any challenge to this finding. (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545–546 [35 Cal.Rptr.2d 574].)

▪ Furthermore, we conclude that the trial court's ruling on this issue is correct. Probate Code section 21610 specifies the statutory share of a decedent's estate that a pretermitted spouse should receive. Probate Code section 21611 provides that the spouse shall not receive a share of the estate under Probate Code section 21610 if, among other things, "[t]he spouse made a valid agreement waiving the right to share in the decedent's estate." (Prob. Code, § 21611, subd. (c).) " 'Public policy discourages a testator's failure to provide for a surviving spouse [citation], but it does not nullify that failure when the testator and spouse have mutually contracted to waive such provision.' " (*Estate of Gagnier* (1993) 21 Cal.App.4th 124, 127 [26 Cal.Rptr.2d 128].)

Probate Code section 141, subdivision (a)(8) states that the surviving spouse may waive "[t]he right to take the statutory share of an omitted spouse." A waiver must be in writing and signed by the surviving spouse. (§ 142, subd. (a).) Probate Code section 143, subdivision (a) provides that a waiver is enforceable unless the surviving spouse proves "[a] fair and reasonable disclosure of the property or financial obligations of the decedent

---

[10] Of course, the terms of a domestic partner agreement may provide for the agreement's termination upon the parties' marriage.

was not provided to the surviving spouse prior to the signing of the waiver" or "[t]he surviving spouse was not represented by independent legal counsel at the time of signing of the waiver." Probate Code section 144 sets forth the circumstances when a waiver is enforceable.

Paragraph 14 in the domestic partnership agreement, signed by Konou and his attorney, specified the following: "No Restrictions on Transfers at Death. Each of the parties hereby waives the right to receive any property or rights upon the death of the other party unless that right is created or affirmed by the other party in a living trust, last will and testament or other written document. Each party's waiver is intended to be an enforceable waiver of that party's rights under Probate Code sections 140–147." The waiver in the agreement unambiguously waived Konou's rights to Wilson's estate, and the record does not include any living trust, last will and testament, or other written document prepared by Wilson that provided for Konou. Accordingly, we conclude that this agreement constituted an enforceable waiver of omitted spouse rights.

## DISPOSITION

The judgment is affirmed. Konou is to pay the costs of appeal.

Kline, P. J., and Haerle, J., concurred.

A petition for a rehearing was denied January 9, 2013, and appellant's petition for review by the Supreme Court was denied March 27, 2013, S208135. Chin, J., was of the opinion that the petition should be granted.