Filed 7/28/15; pub. order 8/21/15 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Marriage of Irwin and Linda Siegel. | |
| IRWIN J. SIEGEL,<br><br>          Appellant,<br><br>v.<br><br>LINDA S. SIEGEL.<br><br>          Respondent. | A140559<br><br>(Alameda County<br>Super. Ct. No. H120972-9) |

Appellant Irwin J. Siegel (Irwin) and Respondent Linda S. Siegel (Linda) were divorced in 1987.[1] They are now in their early 80's. Their marital termination agreement, which merged into a judgment, required Irwin to establish a life insurance trust for Linda, subject to certain terms. In 2013, Linda filed a Request for Order to Disclose Insurance Information, asking for a court order requiring Irwin to provide "proof" that the insurance policy was in existence. Irwin filed a Responsive Declaration consenting to disclose information about his existing life insurance for Linda's benefit, attached some documents, and did not appear at the hearing. At the hearing, the family court judge construed the Request for Order To Disclose Insurance Information as a motion to enforce the marital termination agreement, and issued an order after the hearing which, among other things, required Irwin to establish a $126,916.00 trust with Linda as

---

[1] We refer to the parties by their first names since they have the same last name, and it is much clearer than referring to them as petitioner and respondent. We mean no disrespect by the use of their first names.

the beneficiary. Irwin now appeals, arguing that he was denied due process because the trial court's orders exceeded the relief requested by Linda in the Request for Orders and he had inadequate notice of the relief, and that the family court impermissibly modified a judgment that was nonmodifiable on its terms. We agree that the trial court erred by issuing an order that far exceeded the relief requested by Linda, and reverse.

BACKGROUND

The underlying facts are not in dispute, and we summarize them briefly.

Irwin and Linda were married in 1957. As of June 4, 1987, their marital status was terminated, and a judgment of dissolution was entered. They later entered into a Marital Termination Agreement (MTA) that was approved by the family court and incorporated into a Further Judgment on Reserved Issues, filed December 2, 1987 (Judgment).

The Judgment and MTA required Irwin to pay Linda $2,200 per month spousal support, until such time as Linda died or remarried.[2] A provision was made for support in the event that Irwin predeceased her:

"4.01 Support

". . . .

"C. Upon the death of husband, should husband predecease wife, any remaining spousal support obligation of husband to wife shall be satisfied as follows:

"1. Husband shall forthwith establish an insurance trust for the benefit of wife.

"2. Husband shall, during his life and for so long as he is insurable at reasonable cost, maintain a policy of insurance on his life in a [sic] amount not less than $250,000.

"3. Husband shall designate said insurance trust as the beneficiary of at least $250,000.00 of insurance on his life.

"4. Said insurance trust shall provide that the trust shall, during wife's life, pay monthly to wife in lieu of the spousal support payments she would have received had not

_____

[2] During a period, long since passed, when Irwin was making education and living expense payments for the benefit of an adult son, the MTA provided that Irwin's monthly spousal support payments were decreased.

husband predeceased her, an amount equal to the income of said trust, up to a maximum of $2,200.00 per month. The principal of said trust may be invaded if necessary to make said payments.

"5. Upon wife's death, the corpus of the trust shall be disbursed pursuant to the terms of husband's will.

"Husband and wife understand that the aforementioned provisions concerning spousal support cannot be changed or modified by the court, regardless of the financial or other circumstances of either party."

On August 7, 2013, Linda filed a mandatory Judicial Council form FL-300 Request for Order, checking the box at the top of the form marked "Other" and seeking what she described on the form as an "Order to Disclose Insurance Information." In the section entitled "Request for Order and Supporting Declaration," Linda checked box 8 for "Other Relief" and specified: "*Husband was ordered to establish an insurance trust for the benefit of the wife in the amount of at least $250,000. Husband has not ever and will not provide proof that this policy is or ever was in existance [sic]. Wife has asked repeatedly for this proof and now prays that the court will insist on that proof.*" (Emphasis added.) Linda also checked box 10, where the petitioner was supposed to list the "FACTS IN SUPPORT of orders requested," and restated verbatim what she had typed next to the "relief" sought in box 8. Linda attached three pages from the MTA, including the provisions from section 4.01 ("Support") quoted above.

The order setting the hearing on the Request for Orders was signed by Judge Stephen M. Pulido on August 7, 2013. Box 4 was checked, with the following form language: "You are ordered to appear in court at the date and time listed in item 2 [October 9, 2013 at 9:00 a.m.] to give any legal reason why *the orders requested* should not be granted." (Emphasis added.) The form order also stated in bold text that if the recipient wished to respond to the Request for Order, he must file a Responsive Declaration to Request for Order (form FL-320) and serve it on the opposing party.

Irwin, representing himself, filed a response on September 24, 2013, on the appropriate Judicial Council form. He checked box 8 (c) ("Other Relief"), which was

next to the preprinted text "I consent to the following order," and typed in "For an order that petitioner disclose information about his existing life insurance for respondent." [3] Irwin provided the following "Supporting Information" called for by box 9:

"On May 8, 2012, Petitioner provided respondent information and documentation of his existing life insurance for respondent's benefit, as attached hereto and marked as Exhibits "A" and "B." In addition, Petitioner provides the pertinent portion of his will providing for a trust for respondent's benefit, attached hereto as exhibit "C.""

"Petitioner, who is now 79 years of age and fully retired, does not believe he is insurable at any reasonable cost for life insurance in addition to the existing coverage of $123,084 held for respondent."

Irwin attached a letter to Linda written May 8, 2012 (Exhibit A) enclosing her "usual monthly $2,200 spousal support payment," and giving her an "update . . . about my current life insurance situation." The letter continued: "My life insurance is furnished by the Permanente Medical Group term life insurance policy. That policy coverage automatically is reduced as the physician/retiree ages. It is now at its final nonreducible level of $123,000—. I am no longer insurable and further additional life insurance is no longer available to me. This is all the life insurance I have. [¶] "After my death the $123,000—death benefit will be held in a trust which will pay you $2,200— per month as long as you are alive and unmarried until the amount is used up."

Irwin also attached Exhibit B, a sheet entitled "Life Insurance Coverage for Irwin J. Siegel, M.D. Retirement at September 30, 1998," which indicated that his "coverage" for October 1, 2004, and thereafter was $123,084. This sheet also reflected that his coverage has been reduced from retirement date at age 64 to age 70, and stayed steady at $123,084. The source of Exhibit B was not clear.

---

[3] Although Linda filed the Request for Order that is the basis for this appeal, she was the original "respondent" and Irwin was the original "petitioner" in the dissolution proceeding, and they apparently continued to refer to themselves in this way in the most recent proceeding before the family court.

Irwin attached Exhibit C, which appeared to be a half page redacted from his will, and included a provision about a "life insurance trust." It stated:

"5.1 TRUST FOR BENEFIT OF LINDA SUZANNE SIEGEL. My trustee shall hold, administer, and distribute any life insurance proceeds from my Permanente Medical Group term life policy as a result of my death in a separate trust as set forth in this section. For so long as my former spouse, LINDA SUZANNE SIEGEL, is living and unmarried, my trustee shall pay her the sum of $2,200 . . . per month from such proceeds. Such payments shall continue until the death or remarriage of LINDA SUZANNE SIEGEL, or until the trust is exhausted, whichever occurs first.

Exhibit C also contained a provision that upon the death or remarriage of Linda, Irwin's trustee was to "distribute the remainder of the trust as set forth in Section 4, as if it were part of the residue of my estate." Section 4 was not included in exhibit C.

The hearing on Linda's Request for Order was held on October 9, 2013, before Judge Tara M. Flanagan. Irwin did not appear; Linda appeared and represented herself.

The family court judge acknowledged at the outset that Linda's request for orders was for the disclosure of "financial insurance information," and that Irwin "says he's done that." The judge then gave Linda the option to turn the hearing into something else, asking her: "So is it really that you need him to disclose the financial information or that you feel he's not in compliance with the settlement agreement of the dissolution?" Linda replied that it was the latter.

The court then asked Linda about the trust:

"THE COURT: Well, he says he didn't set one up, right?

"[Linda]: Well, if he didn't set up the trust for me—

"THE COURT: He did not. He says he didn't do it. He says, I didn't do it. I'm uninsurable now because I'm retired. I can't do it at a reasonable cost. All I have is my life insurance policy. That's what I understand his response is."

The court stated its view repeatedly that Irwin didn't have a trust. ("I don't think there is a trust. . . . [¶] There isn't one, so you can't have a copy of what doesn't exist.")

A discussion ensued, with Linda contending that "if [Irwin] doesn't have a trust, then he must set up something for me as the beneficiary. Even this 123,000, I have no trust either."

The family court judge then advised Linda,

"THE COURT: Well, ma'am, usually when there's a life insurance policy there isn't a trust set up, it's just a life insurance policy, and then should the person pass away then the benefits go to the beneficiary, but I understand part of your . . . [¶] —assertion is that you [don't] even have a copy of the policy and you don't really have enough information. But that's—

"[Linda]: No.

"THE COURT: —a separate issue from saying he didn't set up the trust in its entirety. He didn't set up whether you call it a trust or a life insurance policy. Your settlement agreement in your dissolution, there's supposed to be $250,000 available to you, so that's a little bit different issue. . . . [¶] . . . I think we know where there is; there isn't one. I think that's abundantly clear to me."

Linda replied that Irwin "should set up a trust as he was supposed to do when he was a young man," and started to explain why the trust fund was originally supposed to be established. The court interjected that "[i]t doesn't matter" and "I understand it was an important part of the dissolution" and that it was negotiated for and part of the settlement agreement. From there, the court concluded "[s]o it really is just an enforceability issue. You don't need to convince me on the merits of it." The court then took up the question of remedy:

"So the problem, or the one difficulty—I won't say it's a problem—is the settlement agreement reads that husband shall during his life and for so long as he is insurable at reasonable costs maintain a policy on his life in an amount not less than $250,000.

"So it's that reasonableness language, 'at a reasonable cost,' because now he's asserting, well, now I'm 79 and it's not a reasonable cost because, basically, at 79 it's extraordinarily difficult to get a life insurance policy."

The court then observed that "finding a remedy for this missing $127,000 and some change, that is a little more difficult. I'm not saying that the Court doesn't find your argument persuasive." The court invited Linda to tell the court what she would like "the court order him to do," noting that it would "probably cost tens of thousands of dollars to set up a policy."

When Linda replied that Irwin could "well afford it," the court asked about Irwin's monthly income. Linda replied that Irwin had a "very large Keogh plan," a "salary deferred" plan, and owned property. She assured the court that "I know that he well could do it. It's a question of wanting to do it, that's all it's about." The court inquired how long Linda and Irwin had been married, whether they had children, and whether Linda had worked outside the home when she was "younger." Linda replied that she had been a teacher.

Eventually the court observed that Irwin "has chosen not to appear. He did file a response, I have read his response. I am going to take this under submission, meaning I'm going to make a submission, in full, in writing, within the next 10 days." The court elaborated:

"At this point . . . I'm going to tell you that my order is going to include he provide you, within a certain time period, with a copy of the life insurance policy, with all information, true and actual copies of it, and that shows that you are the named beneficiary of the . . . life insurance policy, . . . and that the information he provides you includes the plan administrator information so that you may communicate directly with Kaiser. . . .

"As for the balance of the $250,000 trust that was negotiated for, I'm taking that under submission to consider what the best way would be to make up that balance.

"I do understand your request. It's valid on the four corners of the contract that is part of the marital settlement agreement. It's very clear what he was to do. . . ."

On November 6, 2013, the court issued detailed written findings and orders. The court stated that the Request for Orders filed by Linda "is construed by the Court as a Request for Orders to enforce the Settlement Agreement." The court found that Irwin,

"[b]y his own admission" as shown in his responsive pleading and attachments, had not established a life insurance trust in the amount of at least $250,000 as required by the MTA, "but instead relies upon an alleged Permanente Medical Group Life Insurance Policy, and his purported will to meet this contractual spousal support obligation." The court further found that, other than the letter from Irwin attached to his response filed with the court in connection with the motion, Linda did not have documentation providing her with proof that the Permanente Medical Group exists or that she is in fact the sole named beneficiary of the insurance policy, or that there was a life insurance trust established for her benefit. Moving beyond the failure to provide sufficient documentation, the court then found that Irwin had "not complied with nor performed the terms of the Judgment and Marital Termination Agreement . . . which he is and was legally obligated to do." The court made findings that Irwin had not established an insurance trust, that there was no life insurance policy with death benefits of $250,000 for Linda's benefit, there was no "life trust instrument," and there was "no safeguard or mechanism or instrument that e[ns]ures [Irwin's] future spousal support obligations to [Linda] should [Irwin] predecease her." With that, the court stated that Linda's "Request for Orders filed 8-7-13 is granted."

However, the page and a half of orders that followed were broad and went beyond Linda's simple request for disclosure of an insurance policy. Among other things, Irwin was ordered to name Linda as "the sole primary beneficiary" of his insurance policy from Permanente Medical Group in the event of his death and provide proof that he had done so within seven days of the date of the Order. Further, Irwin was ordered, within seven days of the date of the order, to establish a "separate trust instrument in an amount no less than $126,916.00 established for the purpose of making monthly payments to [Linda] in the amount of $2,200 per month for spousal support, as ordered in the 6-26-1987 Judgment. Said payments from the trust shall begin upon either a) should there be any delays in [Linda] receiving the life insurance proceeds upon death of [Irwin]; or b) exhaustion of the proceeds of the $123,084 life insurance benefits paid to (55 months @$2,200 per month."

This appeal by Irwin followed.

DISCUSSION

The heart of Irwin's appeal is that he was denied due process because the court held a hearing and made orders on issues about which he had no notice. The facts, as we have summarized them here, are undisputed. To the extent that Irwin challenges the family court's authority to issue orders beyond the scope of the notice, he has raised a question of law which we review de novo. (*Herbst v. Swan* (2002) 102 Cal.App.4th 813, 816; *Estate of Wilson* (2012) 211 Cal.App.4th 1284, 1290 [questions of law reviewed de novo]; *Radian Guaranty, Inc. v. Garamendi* (2005) 127 Cal.App.4th 1280, 1288 [application of statutory standard to undisputed facts reviewed de novo].)[4]

" 'It is a fundamental concept of due process that a judgment against a defendant cannot be entered unless he was given proper notice and an opportunity to defend. (U.S. Const., [Amend.] XIV . . . .)' (*In re Marriage of Lippel* (1990) 51 Cal. 3d. 1160, 1166 [(*Lippel*)].) . . . [A] dissolution court cannot grant unrequested relief against a party who appears without affording that party notice and an opportunity to respond. [Citations.] Due process requires affording a litigant a reasonable opportunity, by continuance or otherwise, to respond to evidence or argument that is new, surprising, and relevant. [Citations.]" (*In re Marriage of O'Connell* (1992) 8 Cal.App.4th 565, 574 (*O'Connell*).)

Here, the written Request for Orders sought "proof . . . that this [insurance] policy is or ever was in existence," and an order that the court "will insist on that proof." Irwin filed a response which indicated his written consent to this order. The transcript of the

---

[4] Linda contends that because this is an appeal from an order regarding whether Irwin has complied with the terms of a marital settlement agreement, it is a discretionary trial court ruling that we should review for abuse of discretion, citing *County of Lake v. Antoni* (1993) 18 Cal.App.4th 1102, 1105 ("[w]e review support awards for abuse of discretion") and *In re Marriage of Cooper* (2008) 160 Cal.App.4th 574, 580 (abuse of discretion standard generally applies to orders regarding division of community interest in retirement rights). She notes that the test for abuse of discretion is " 'whether or not the trial court exceeded the bounds of reason, all of the circumstances before it being considered,' " quoting *In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598. Even if we were to review on an abuse of discretion standard, our conclusion would be the same.

brief hearing, which we have summarized above, speaks for itself. The court, on its own volition, chose to treat the Request for Orders as more than an Order to Disclose Insurance Information, and awarded relief far in excess of what was sought.

Linda contends that the three sentences in her Request for Orders placed Irwin on "adequate and sufficient notice that the trial court would be hearing and considering whether he had complied with his obligations under the Judgment and Marital Termination Agreement," and that he "understood that [Linda] was not just asking for paperwork; [Linda] was seeking his compliance with the Judgment and Marital Termination Agreement." Linda contends that because Irwin was a party to the MTA he could not claim surprise about the nature and extent of his obligations, and when he received notice of the Request for Orders "he was squarely put on notice of the nature of the obligation and the dollar amount that Respondent was seeking to enforce." In Linda's view, this is a "fabricated due process violation as a basis for overturning the trial court's orders to enforce the very obligations under the Marital Termination Agreement that [Irwin] had ignored and failed to perform."

This was plainly not the case. If Linda had wanted to seek other or different orders, she could have done so and, indeed, may still do so. Irwin could have no way of knowing from the straightforward Request for Orders that the family court would modify the MTA, impose additional terms that were not in the Judgment, and require him to establish and fund a separate trust instrument in an amount no less than $126,916.00.

Irwin relies on Code of Civil Procedure section 580, subdivision (a),[5] which pertains to default judgments following a defendant's failure to answer a civil complaint, and cases that construe that statute in the family law context. Section 580, subdivision (a) provides that "The relief granted to the plaintiff, if there is no answer, cannot exceed that demanded in the complaint, in the statement required by Section 425.11, or in the statement provided for by Section 425.115; but in any other case, the court may grant the plaintiff any relief consistent with the case made by the complaint and embraced within

_____

[5] All undesignated statutory references are to the Code of Civil Procedure.

the issue. The court may impose liability, regardless of whether the theory upon which liability is sought to be imposed involves legal or equitable principles."

Section 580, subdivision (a) applies in marital dissolution proceedings. (*In re Marriage of Kahn* (2013) 215 Cal.App.4th 1113, 1117.) Its purpose is to " ' "guarantee defaulting parties adequate notice of the maximum judgment that may be assessed against them." [Citations.]' (*Stein v. York* (2010) 181 Cal.App.4th 320, 325). '[D]ue process requires notice to defendants . . . of the potential consequences of a refusal to pursue their defense. Such notice enables a defendant to exercise his right to choose . . . between (1) giving up his right to defend in exchange for the certainty that he cannot be held liable for more than a known amount, and (2) exercising his right to defend at the cost of exposing himself to greater liability.' (*Greenup v. Rodman* (1986) 42 Cal.3d 822, 829.)" (*In re Marriage of Kahn*, *supra*, 215 Cal.App.4th at p. 1117.)

Irwin points to *Lippel, supra,* 51 Cal.3d at page 1166, where the Supreme Court held that it was a denial of due process to enter a default judgment ordering a husband to pay child support where the wife's petition for marital dissolution did not request it, and no notice of a request for child support was ever served on the husband.

In so holding, the Supreme Court wrote that "[i]t is fundamental to the concept of due process that a defendant be given notice of the existence of a lawsuit and notice of the specific relief which is sought in the complaint served upon him. The logic underlying this principle is simple: a defendant who has been served with a lawsuit has the right, in view of the relief which the complainant is seeking from him, to decide not to appear and defend. However, a defendant is not in a position to make such a decision if he or she has not been given full notice. The instant case is a prime example of the foregoing; the petition which was served on [husband] sought no monetary relief from him. Therefore, there was no incentive for [husband] to appear and defend." (*Lippel*, *supra*, 51 Cal.3d at p. 1166.)

Irwin analogizes his situation to the husband in *Lippel*. Linda's request for orders did not give him notice that the family court would "construe" it to seek relief broader than that prayed for, in essence a motion to enforce compliance with the settlement

agreement. As such, when he consented to the relief request, he exercised his right "not to appear and defend." (*Lippel, supra*, 51 Cal.3d at p. 1166.)

Linda is dismissive of Irwin's reliance on section 580, *Lippel*, and the other cases cited by Irwin relying on section 580, since they all relate to default judgments and this proceeding is clearly not one. She is correct to a certain extent; it is an imperfect analogy. Instead, Linda relies on language in *O'Connell, supra,* 8 Cal.App.4th at page 574, a family law case where an ex-wife successfully moved to enforce an order modifying spousal support regarding life insurance over the objection of the surviving second wife who contended that the issue of modifying the life insurance had not properly been before the court. But the facts of *O'Connell* were very different. In that case, husband filed a motion seeking reduction in his child and spousal support due to disability. Ex-wife's attorney offered by letter and phone call (but without a formal pleading in response to the motion) to agree, so long as she and her children were named beneficiaries to a life insurance policy. Husband was not present at the hearing, but was represented by counsel. When the request to modify the insurance was brought up at the hearing, husband's counsel objected on several grounds, including that it had not been made through formal pleadings since wife neither filed a responsive pleading nor filed an affirmative motion to have it heard, and husband's counsel "didn't know that until, I guess just a day or two ago when [the attorneys] discussed it on the telephone." (*Id*. at pp. 570-571, fn. 3.) The court ordered reductions in monthly spousal support to nothing, and greatly reduced the child support, but ordered that husband name his ex-wife and minor son as beneficiaries on the life insurance policy along with his current wife. When husband died shortly thereafter, ex-wife filed a motion seeking enforcement of the life insurance modification order alleging that husband had not changed beneficiaries before he died. Second wife filed a motion to vacate the order modifying the life insurance. In denying the motion to vacate, the court held that ex-wife was not required to "formally request" modifying husband's life insurance by written motion or opposition to husband's reduction motion "in order to put the life insurance in issue" because husband's "motion itself put the issue before the court." (*Id*. at pp. 574-575.) The court

went on to describe that in "establishing and modifying spousal support, courts are required to consider a broad range of factors" by statute, citing Family Code section 4801, and the same is true for establishing and modifying child support. (*Id*. at p. 575.) The court continued, "Thus, courts have not been precluded from considering the big picture by the particular phrasing of a motion to establish or modify support. A motion to increase support has been held to put modification in general in issue and authorizes the court 'to either increase or decrease the payments to meet the equities of the situation,' though the opponent has not formally requested a decrease. [Citation.]" (*Id*. at p. 575.)

*O'Connell* is distinguishable. The order in *O'Connell* was made at a contested hearing where the husband, represented by counsel, was the spouse who made the motion to modify his support obligations to his ex-wife and children. By having made the motion for that relief, the husband in *O'Connell* put in play the "equities of the situation." (*O'Connell, supra,* 8 Cal.App.4th at p. 575.) Here, Irwin was not the moving party, nor was he represented at the hearing. Linda made the motion, and it was a very specific one: disclosure of insurance documentation. It was not a motion to modify the 1987 judgment or to modify any support obligations.

Linda also relies on *In re Marriage of Andresen* (1994) 28 Cal.App.4th 873 (*Andresen*). In that case, husband unsuccessfully sought to vacate a default judgment in a marital dissolution that he claimed was void because the wife's family law form pleadings didn't allege the value for certain property items, identify certain community assets, or request an "equalizing payment" from husband. (*Id*. at p. 877.) The *Andresen* court, citing *Lippel*, *supra,* easily disposed of husband's appeal: "As we read *Lippel*, due process is satisfied and sufficient notice is given for section 580 purposes in marital dissolution actions by the petitioner's act of checking the boxes and inserting the information called for on the standard form dissolution petition which correspond or relate to the allegations made and the relief sought by the petitioner." (*Id*. at p. 879.) In *Andresen* the wife had in fact checked all of the correct boxes on the form, and consistent with the choices she made, attached a property declaration which listed assets and liabilities. Further, consistent with the " 'instructions' " on the declaration form, she did

not assign values or propose a particular division.  (*Ibid*.)  On these facts, the court concluded:  "[t]herefore, because the wife properly and fully completed the petition and its necessary attachments *to the extent of the relief requested on the face of those documents*, the husband was given adequate notice that the wife sought a division of the property and liabilities identified in the wife's papers."  (*Ibid*., emphasis added.)

Linda focuses on language in *Andresen* that family law courts have broad discretion to determine the manner in which community property is awarded, and that "when a petitioner asks the court to determine the rights of the parties as to specified property, the respondent is necessarily on notice that the court will undertake to assess and then divide the alleged community equally between the parties."  (*Andresen*, *supra*, 28 Cal.App.4th at p. 880.)  But understood in context of the facts in *Andresen*, this language provides no support for Linda's position.  If anything, it supports Irwin's:  Linda properly and completely filled out a request for an order to disclose insurance information (not for a division of property), checking the boxes.  She did not ask the court to determine the rights of the parties to a division of property or even to enforce the judgment to its fullest extent.  This is the extent of the notice she gave Irwin.

We conclude that the trial court erred.  Linda's request for an order to disclose insurance information as "proof" that a life insurance policy existed could not be treated, consistent with due process, as notice that the family court would take the matter under submission and issue an order requiring Irwin to establish and fund a $126,910 trust.  As *O'Connell* makes clear, a "dissolution court cannot grant unrequested relief against a party who appears without affording that party notice and an opportunity to respond." (*O'Connell, supra,* 8 Cal.App.4th at p. 574.)  The order must be reversed.

Because of our holding, we do not address Irwin's arguments as to the hypothetical outcome if, counterfactually, he had not filed any written response; whether the trial court impermissibly modified nonmodifiable orders; and whether the trial court

misinterpreted the 1987 order.  We leave the latter two arguments to be made to the family court, if necessary, in the first instance.[6]

DISPOSITION

The family court's order is reversed.

_____

Miller, J.

We concur:

_____

Richman, Acting P.J.

_____

Stewart, J.

---

[6] In respondent's brief, Linda asserts facts that are not supported in the record before us, including that the underlying purpose of the establishment of the insurance trust was to compensate her for having given up her retirement as a teacher for over 30 years, and that she did this in order to contribute to Irwin's private Keogh deferred salary retirement and savings plan.  Whether these are relevant to the family court's determination or not, they are not properly before us.

Filed 8/21/15 after filing
nonpublished opinion on 7/28/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Marriage of Irwin and Linda Siegel. | |
| IRWIN J. SIEGEL,<br><br>    Appellant,<br><br>v.<br><br>LINDA S. SIEGEL.<br><br>    Respondent. | A140559<br><br>(Alameda County<br>Super. Ct. No. H120972-9) |

BY THE COURT:

The opinion in the above-entitled matter filed on July 28, 2015, was not certified for publication in the Official Reports.  For good cause and pursuant to California Rules of Court, rule 8.1105, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

Dated: _____          _____

                                             Richman, Acting P.J.

Trial Court:  Superior Court of Alameda County

Trial Judge:  Hon. Tara M. Flanagan


Attorney for appellant      Garrett C. Daily


Attorneys respondent      Wallace C. Doolittle
             James P. Downs